IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE AND UNITED BIOLOGICS, LLC D/B/A UNITED ALLERGY SERVICES, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. _____ |
| LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY, D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA, HUMANA, INC., BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., ALLMED HEALTHCARE MANAGEMENT, INC. | § § § § § | JURY TRIAL DEMANDED |
| Defendants. | | |

## COMPLAINT

Plaintiffs United Biologics, LLC d/b/a United Allergy Services ("UAS") and the Academy of Allergy & Asthma in Primary Care ("AAAPC") (collectively "Plaintiffs") file this action against Louisiana Health Service and Indemnity Company, d/b/a Blue Cross and Blue Shield of Louisiana ("BCBSLA"), Humana, Inc. ("Humana"), Blue Cross and Blue Shield of Kansas, Inc. ("BCBSKS"), and AllMed Healthcare Management, Inc. ("AllMED") (collectively "Defendants").

## NATURE OF THE CASE

1.     This case concerns a conspiracy and agreement among various health insurance company competitors and those paid for and acting on their behalf or in coordination with them to restrict competition in the relevant markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies (referred to herein as the markets for "allergy testing and

allergen immunotherapy") in local areas throughout Louisiana, Kansas, and other local markets serviced by Humana.

2.      When primary care, family physicians, and pediatricians started working in conjunction with UAS in an effort to treat their patients who suffer from allergies and asthma, certain health insurance companies started to conspire together to stop reimbursing for that treatment based on discrimination and the incentive not to pay. Because these providers have not been reimbursed for this important preventative service, patients in Louisiana, Kansas, and in other states throughout the country have suffered without this care. BCBSLA, BCBSKS, Humana, and an independent review organization, AllMED, agreed with each other to spread the word on primary care physicians and UAS to stop reimbursement and to exclude them from the market. Through audits, investigations, recoupment and overpayment notices, denied claims, threats to kick providers out of the network, and communications with governmental and regulatory bodies to eliminate primary care and UAS from the market, the Defendants have been successful in their group boycott and conspiracy to fix prices in reducing output and inflating prices for their members.

3.      The result has been a threatened and actual restriction on competition in the market for allergy testing and allergen immunotherapy to the ultimate detriments of consumers, or the Defendants' health insurance members.  By attempting to take away competitors' means to compete, namely reimbursement by third-party payors such as BCBSLA, BCBSKS, and Humana, and by intimidating physicians by threatening them with audits, investigations, denied claims, and network terminations, Defendants have aimed to essentially deprive the market of a lower cost alternative and deprive patients of the ability to choose which businesses and physicians may provide allergy testing and allergen immunotherapy.  A direct consequence of

this activity is that most consumers are forced to either pay inflated prices for allergy testing or allergen immunotherapy by utilizing a specialist, or consumers go without these services. Because such anticompetitive conduct aimed at private parties is not protected activity, but forbidden by the Sherman Act, this complaint is filed to put an end to this conduct and restore and protect competition.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

4.     This action is brought under Section 1 of the Sherman Act, 15 U.S.C. §§ 1-2.

5.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1367(a).  Service of process may be made upon a corporation not only in the jurisdiction where it is an inhabitant, but also in any district it may be found or transacts business.  *See* 15 U.S.C. § 22.  Defendants all have sufficient contacts with the United States and the exercise of jurisdiction over them in this District comports with traditional notions of fair play and substantial justice.

6.     The Court may exercise personal jurisdiction over Defendants BCBSLA, and Humana because they are located in Louisiana and have continuous and systematic business contacts with Louisiana that are substantial, and because this action arises out of and is related to those purposeful contacts with Louisiana.

7.     This Court may exercise personal jurisdiction over Defendants BCBSKS and AllMED because the claims in this suit arise out of and are related to those entities' purposeful contacts with the State.  For example, both BCBSKS and AllMED intentionally, knowingly, and continually communicated with BCBSLA, which is located in Louisiana about its reimbursement policy in Louisiana knowing their anticompetitive conspiracy could inflict harm in Louisiana.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants inhabit or transact business in this District and a substantial part of the events or omissions

giving rise to these claims occurred in this District, including, but not limited to, the conspirators' attempts to organize a group boycott and restrict competition and output using insurance companies, governmental entities, and physicians located in this district to harm Plaintiffs. In addition, venue is proper in this District pursuant to 15 U.S.C. § 22 because Defendants transact business in the District.

9.     Defendants' conduct, including their attempts to organize a group boycott against and restrict competition and output from non-allergist physicians and their businesses and support staff, including AAAPC members and UAS, and their conspiracy to monopolize the market for allergy testing and allergen immunotherapy, all cross state lines. Defendants' activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate commerce.

## PARTIES

### Plaintiffs

10.    AAAPC is a 503(C)(6) non-profit organization of over 250 member physicians with its principal place of business in Washington, the District of Columbia. AAAPC is an organization that fosters the ability of primary care physicians to provide high quality, patient accessible diagnostic and therapeutic allergy and asthma care. Part of AAAPC's purpose is to represent the interests of over 2,000 primary care physicians that provide allergy and asthma care to their patients, including the ability to practice in the market for allergy testing and allergen immunotherapy in local areas throughout the United States. AAAPC seeks injunctive relief on its antitrust claims brought in a representational capacity on behalf of its members. It has standing to bring these claims on behalf of its members to protect their interests, as those members would have standing to sue individually, but are not necessary parties to this suit. AAAPC hereby appears through undersigned counsel in this cause.

11.     United Biologics, LLC d/b/a United Allergy Services is a Delaware limited liability company with its principal place of business in San Antonio, Bexar County, Texas. UAS participates in the market for allergy testing and allergen immunotherapy through providing technician and support services for physicians practicing allergy testing and allergen immunotherapy in local areas within Kansas, Louisiana, and 24 other states.  As a result, UAS and the primary care and other physicians UAS supports, compete directly with the businesses of board-certified allergists.  As a direct target of Defendants' activities to eliminate it from the market for allergy testing and allergen immunotherapy, and thus reduce competition in that market, UAS has standing to seek treble damages and injunctive relief under the Clayton Act in addition to standing for its other claims.  UAS has appeared through undersigned counsel in this cause.

## **Defendants**

12.     Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a mutual-benefit insurance corporation organized under the laws of Louisiana. BCBSLA may be served through its registered agent, Michele S. Calandro, at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.

13.     Humana Inc. is a Delaware for-profit corporation with its principal place of business at 500 West Main Street, Louisville, Kentucky 40202. Humana may be served through its registered agent at Corporation Service Company, 421 West Main Street, Frankfort, Kentucky 40601.

14.     Blue Cross and Blue Shield of Kansas, Inc. BCBSKS is a Kansas for-profit corporation with its principal place of business at 1133 SW Topeka Boulevard, Topeka, Kansas

66629. It may be served through its registered agent at 1133 Topeka Boulevard, Topeka, Kansas 66629.

15.     AllMed Healthcare Management, Inc. is an Oregon for-profit corporation with its principal place of business at 621 SW Alder Street, Suite 740, Portland, Oregon, 97205. AllMED may be served through its registered agent, WSCJ Business Services, Inc. at 805 SW Broadway, Suite 2440, Portland, Oregon 97205.

16.     Defendants' acts detailed herein were authorized, ordered, and/or done by them or their organizations, businesses, officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

## BACKGROUND

17.     This case is about the treatment of seasonal and perennial allergies by primary care and family physicians for their patients. When family physicians and primary care providers started offering these services in conjunction with UAS, competitors and health insurance companies started to notice. And when patients began using their own primary care and family doctors working with UAS instead of the competitors' products—including 1) by using one type of allergy test over another product and, 2) receiving allergy testing from primary care practices instead of through specialists's practices like those owned by board-certified allergists—third party payors like Defendants decided to conspire with allergists, manufacturers, and other third-party payors and to eliminate this competition.  In this case, the largest payor in the state of Louisiana, BCBSLA, colluded with other dominant market participants like BCBSKS, Humana, and an independent medical review organization—along with many other co-conspirator competitors including other payors, board-certified allergists, their businesses, their trade associations, and other similarly situated market participants—to exclude UAS and the physicians in contract with it from the market.

18.     Many physicians have historically treated patients for allergy-related symptoms, especially in treating aero-allergies and mold allergies, otherwise known as seasonal and perennial allergies. These physicians, who include board-certified pediatricians, board-certified family physicians, board-certified otolaryngologists ("ENTs"), and other specialists and primary care physicians, have practiced allergy care long before the creation of American Board of Allergy and Immunology in 1971. The ABAI only qualifies physicians who are already board-certified in either pediatrics or internal medicine and who participate in a three-year fellowship in an ABAI training program (the physicians so qualified by ABAI are herein referred to as "board-certified allergists"). Currently there are fewer than 3,000 board-certified allergists in the United States and the number of fellowships and board-certified allergists is shrinking. There are fewer than 40 board-certified allergist practices in the state of Louisiana, and the vast majority of those providers are located in major metropolitan areas like Baton Rouge and New Orleans. In Kansas, there are fewer than 30 board-certified allergist practices in the state. The vast majority of these specialists are located in metropolitan areas, including Overland Park, Kansas, Topeka, Kansas, and Wichita, Kansas. With almost 3 million people living in Kansas, and almost 5 million people living in Louisiana, board-certified allergists cannot treat all people who are affected by seasonal and perennial allergies. It is estimated that currently 50-60 million Americans are affected by allergic rhinitis, which is one of the fastest growing health care epidemics in the United States. Unfortunately, only 2-6% of the population receive immunotherapy, a treatment that actually treats the underlying cause of allergies unlike pharmacopeia and other drugs which merely masks a patient's symptoms. A significant factor in this disconnect in treatment is that patients cannot afford to see specialists, cannot wait for longer appointment times from specialists, and may live too far away in rural areas to make it practical or viable to take time off from work or school.

19.     While the number of physicians who receive ABAI accreditation is shrinking, and in states like Louisiana and Kansas is already extremely low for the general population, board-certified allergists and their businesses wield considerable influence in the markets for allergy testing and allergen immunotherapy.  Almost every practicing board-certified allergist is in the business of allergy skin testing and allergen immunotherapy.  Collectively, board-certified allergists as a group participate in more allergen immunotherapy than any other player in the market. But since there are fewer than 3,000 of them in the United States, and 50-60 million people are affected by allergic rhinitis, the dominant players in the immunotherapy market—board-certified allergists—cannot possibly treat the epidemic.

20.     Enter UAS. In 2009, United Biologics, LLC was formed and began doing business in San Antonio, Texas under the name "United Allergy Labs" or "UAL," now currently doing business under the name United Allergy Services or UAS.  UAS's business model represented a response to the shortage of physicians who practiced allergy testing and allergen immunotherapy despite the growing need for those services.  Though some family physicians and other primary care physicians practiced allergy testing and allergen immunotherapy, most did not based on the large economic barrier to entry into the market. Providers must purchase and stock the necessary allergy testing equipment and antigens for immunotherapy, as well as train and maintain technicians to assist in administering tests and preparing immunotherapy. These expenses normally prevent most primary care physicians from providing allergy testing and allergen immunotherapy. UAS was formed to help primary care physicians and their businesses overcome this economic barrier by contracting with those businesses to assist those business's entry into the market.

21.     UAS contracts with medical providers, including primary care and family physicians, to provide the equipment and non-physician technician services necessary to facilitate the treatment of allergy skin testing and immunotherapy in a cost-effective manner. In exchange for these services, the provider pays UAS a set fee. Since 2009, UAS has assisted more than 2,000 primary care providers of allergy testing and allergen immunotherapy across 29 states to enter the market for allergy testing and allergen immunotherapy. In Louisiana, for example, UAS partnered with almost 70 primary care physicians to treat their patients for seasonal and perennial allergies. Many of these physicians worked in rural areas and provided a necessary service that was not possible without that UAS's assistance.

22.     When a physician works with UAS—overcoming the barriers of entry into the market for allergy testing and allergen immunotherapy—that provider is able to treat his or her patients more effectively. The only known potential cure or actual treatment of allergic rhinitis for seasonal and perennial allergies is allergen immunotherapy, a process of introducing allergens incrementally into the patient's system to desensitize the patient to such allergens. Physicians who provide care through allergen immunotherapy do so by first testing the patient for allergies through use of a skin prick test or an allergy blood test.  Before the entry of UAS into the market, primary care physicians often would refer patients with seasonal and perennial allergies to reference laboratories for allergy blood testing or to board-certified allergists for allergy skin testing and immunotherapy. With the entry of UAS, however, primary care physicians began utilizing the skin prick test in their own offices with the assistance of UAS, removing the referral to reference laboratories for allergy blood tests and board-certified allergists for allergy skin prick tests. This cost-effective and more accessible system threatened these competitors' referral network from primary care physicians and caused third-party payors,

9

like Defendants, to pay more upfront in preventative medicine by reaching far more patients than board-certified allergists could in their respective markets.

### THE PRODUCT & GEOGRAPHIC MARKETS FOR ALLERGY TESTING AND ALLERGEN IMMUNOTHERAPY

23.     To compete in the market for allergy testing and allergen immunotherapy, allergy-services companies or other related businesses rely on physicians licensed in that particular state to practice medicine, technicians for which there is no licensing process in most states, and other employees, who either administer or participate in the testing or immunotherapy preparation. The firms must also purchase all necessary equipment to compete, including skin prick test kits, antigens, needles, instruments, and other materials necessary to perform allergy testing and preparation of allergen immunotherapy. The firms must also be paid for the services performed, either by the patient directly, or by a "third-party payor," such as a commercial health insurance company, a managed care health plan, Medicare, or Medicaid. Approximately 98% of the services for allergy testing and allergen immunotherapy are paid for at least in part by third-party payors, and those services are billed to those third-party payors under agreements or regulations that require submissions in accordance with the Current Procedural Terminology ("CPT") code set maintained by the American Medical Association. Providers rely on this reimbursement from payors like Defendants, as they cannot run their businesses without payment for the services they perform for their patients. And since the providers that most often contract with UAS are primary care and family physicians, they offer myriad services for their patients—far beyond allergy testing and allergen immunotherapy. If a provider gets a denied claim, or is notified that he or she will be audited or investigated, or even kicked out of a payor's network, that decision can be signicantly detrimental to that provider and the provider's practice.

24.     Currently, there is no substitute for either allergy testing or allergen immunotherapy in effectively diagnosing or treating seasonal or perennial allergies. During the diagnosis of a patient with seasonal and perennial allergies, the physician performs a physical examination of the patient, and based on that examination and the patient's medical history, may recommend to the patient a skin prick test.  If the patient consents, the skin prick test is typically applied by a technician to the patient's skin at the direction of the physician.  The test is made up of small amounts of antigen that correspond to clinically relevant allergens for a specific region. The skin reacts to the allergic materials contained on the test, and the technician usually measures and records the size of the reaction, and the physician reviews and interprets the results.  If a provider bills a third-party payor for a skin prick test, the provider does so under CPT Code 95004.

25.     Alternatively, some physicians may refer a patient with seasonal and perennial allergies for an allergy blood test at a reference laboratory instead of performing skin prick test in the physician's office. When the physician recommends an allergy blood test, the physician refers the patient to a reference laboratory like Quest Diagnostics, which draws the patient's blood and applies an instrument, such as ImmunoCAP, which is manufactured by Thermo Fisher Scientific, Inc. ("Thermo Fisher").  The physician prescribes the patient an ImmunoCAP allergy blood test, either by a regional profile of allergens or occasionally through the physician choosing individual allergens. Phadia determines regional profiles based on the area of the country and the allergens that patients are consistently allergic to in that area. Regional panels are normally 28-30 allergens, and for seasonal and perennial allergies, the panel would be the environmental panel for that region. In Louisiana, for example, the regional panel includes pollens, danders, grasses, molds, and cockroach. The patient then visits a reference laboratory,

either in the physician's office or in a service center, to have his or her blood's drawn for the test. The reference laboratory processes the patient's blood and sends the results back to the physician. These reference laboratories include Quest Diagnostics, Inc., Clinical Pathology Labs, and Laboratory Corporation of America, and they bill third-party payors under CPT Code 86003. The cost for a regional panel is approximately $900 per patient, which is more than triple the cost of a standard panel for an allergy skin test associated with the same region.

26.     Allergy testing, through either a skin test or a blood test, as described above, is a necessary prerequisite for a patient to be considered for allergen immunotherapy. If the physician determines that a patient is allergic to an allergen through testing, the physician may recommend allergen immunotherapy to the patient.  Should the physician deem it appropriate to place the patient on allergen immunotherapy and the patient consents to the treatment, the allergen immunotherapy is typically prepared by a technician under the physician's supervision.  The allergen immunotherapy is composed of antigens that are mixed with a diluent.  The mixture is then diluted into serial dilution vials for administration to the patient starting with the lowest concentration and progressing to the highest concentration, called a "maintenance dose."  If a firm bills a third-party payor for the preparation of allergen immunotherapy, the firm does so under CPT Code 95165.

27.     The most common form of administration of allergen immunotherapy in the United States is through the use of subcutaneous shots, otherwise known as "SCIT" or "allergy injections."  If a firm bills a third-party payor for the administration of SCIT or allergy shots, the firm does so under CPT Code 95115 for a single injection or 95117 for two or more injections if those injections are administered in the office by a technician.  Many physicians in their own professional judgment allow some of their patients to self-administer allergy shots outside of the

office, particularly those patients who demonstrate a low risk of side effects and who would benefit from the increased rate of compliance and lower costs that are associated with self-administration.   Historically and today, a majority of physicians who prescribe allergen immunotherapy for their patients recommend patient self-administration in appropriate cases. Self-administration is a safe and effective method for certain patients and is also less expensive, because the patient and their insurer are not billed for shot administrations that the patient self-administers and the patient does not have to travel to the physician's office every week.

28.     Most board-certified allergists, however, routinely require the patient to visit their office for allergy shots, which means that a patient will have to travel to a board-certified allergist's office two times a week, and for up to three years of immunotherapy treatment. Board-certified allergists also charge for shots and bill the patients or their insurance company, significantly raising the price for the patient and for the payor. When a board-certified allergist is located in a metropolitan area, and a patient is located in a rural area, visiting an office two times a week for up to three years of immunotherapy treatment is impractical and expensive.

29.     Given travel cost and time considerations for the treatment of seasonal and perennial allergies, there is a limit to how far patients will typically travel for allergy testing and allergen immunotherapy.  The area of effective competition, and hence the geographic scope of the market for allergy testing and allergen immunotherapy from the patient side, therefore tends to be relatively localized.  Allergy treatment services are offered in all major cities in the country and in some smaller cities as well. Geographic market boundaries for a relatively localized market are similar to boundaries of cities, as patients will commonly travel within a city but not from one city to another.  Because patients typically seek medical care close to their homes or workplaces, they strongly prefer health care services, including allergy testing and allergen

immunotherapy, close to their homes and workplaces.  The most common method to determine the localized areas where patients travel for such services is use of Core Based Statistical Areas (CBSAs).  The economic reality of receipt of these services dictates these boundaries. It is not typically economically feasible for a patient to travel to another CBSA for non-ambulatory services such as allergy testing and allergen immunotherapy given the economic tangible and intangible costs involved with such travel. For example, a patient in New Orleans is highly unlikely to travel to Baton Rouge just to obtain an allergy test or allergen immunotherapy. While the market may be a local one, the Defendants' actions are aimed at foreclosing an entire class of competitors and the Defendants have attempted to impact localized markets in which they practice, including for example, every localized market in Louisiana, Kansas, and various localized markets that Humana participates in across the country.

## INCREASE IN COMPETITION IN THE RELEVANT MARKET

30.    Together, primary care physicians and UAS have provided a safer, less expensive, and more widely available alternative for consumers than the businesses of board-certified allergists and the largest manufacturer of allergy blood tests, Thermo Fisher, in the market for allergy testing and allergen immunotherapy.  The entry of hundreds of additional primary care physicians since 2009 in the relevant geographic markets in Texas, Louisiana, Kansas, and across the country, where BCBSLA, BCBSKS, and Humana cover patients for allergy testing and allergen immunotherapy, began to address the 94-98% of allergy patients who could benefit from allergen immunotherapy but unfortunately go untreated.

31.    Those primary care physicians who have entered the market offer a lower-cost option to patients, are more conveniently located to the patients, and have shorter wait times for an appointment and shorter wait times in the office.  If they are able to find a specialist in their

geographic area, they generally have to wait on average 15 days for an appointment—compared to a family physician or primary care physician where they may only have to wait 3 days. These patients also welcome the opportunity to receive this treatment by their own primary care physician, family physician, or pediatrician—who they regularly see for their family care.

32.     Additionally, those patients who have been permitted to self-administer their allergy shots have also benefitted in reduced cost by not being charged as often for shot administration, or from incurring the expense of taking off work or school to travel to a medical facility for shot administration. If a patient undergoes immunotherapy with a board-certified allergist, for example, that patient will have to travel to the specialist's office at least twice a week for months, or years.

33.     Additionally, the system as a whole has benefitted from the increased utilization of allergen immunotherapy, as studies have shown that preventative care like immunotherapy reduces the overall costs to patients in terms of expenses for medication, sick days, office visits, and hospital visits for more chronic conditions that develop when the patient goes untreated by immunotherapy.

34.     Despite the overall benefits to health insurance in general, some payors, such as Defendants, sought to eliminate this new source of competition to protect their short term interests. Defendants noticed an influx of primary care physicians treating more patients, spoke to each other about the threat of primary care and UAS performing this necessary service, and decided to conspire together to eliminate the presence of these new market participants. If third-party payors can deny claims and audit providers, thereby not paying them for their services and intimidating them from engaging in those services in the future, they save money, fix prices, and add to their surplus. The Defendants are dominant players in the health insurance context for

their respective geographic markets, and continually solidify that dominance by denying claims from providers, inflating premiums for members, while minimizing competition.

35.     BCBSLA is the dominant insurer in the state of Louisiana. BCBSLA exercises market power in the commercial health market through Louisiana; as of 2010, at least 73 percent of Louisiana residents subscribed to full-service commercial health insurance in the individual market and at least 80 percent of Louisiana residents in the small group market are subscribers of BCBSLA. As a result of BCBSLA's market dominance and inflated premiums, BCBSLA has amassed a massive surplus; between 2004 and 2008, BCBSLA's surplus rose from \$352.7 million to \$621.1 million. As of 2010, BCBSLA's surplus exceeded \$706.6 million. BCBSLA enjoys significant market dominance in the state of Louisiana and has the market power to continue to raise its premiums and deny claims for reimbursement—adding to its surplus. Louisiana is consistently listed on the American Medical Association's list of least competitive states for health insurance markets; in 2014, for example, Louisiana was the fifth least competitive state as BCBSLA enjoyed 62% of the market for commercial health insurance.

36.     BCBSKS is the dominant insurer in the state of Kansas. BCBSKS exercises market power in the commercial health market through Kansas; as of 2011, at least 47 percent of the Kansas residents who subscribe to full-service individual commercial health insurance and at least 58 percent of the Kansas residents who subscribe to small group policies are subscribers of BCBSKS. As the dominant insurer in Kansas, BCBSKS has inflated its premiums and used its market dominance to deny claims and solidify its surplus.

37.     Humana is one of the largest health insurance payors in the country with almost ten million members enrolled nationally. Humana has a 2.87 percent national market share, and enjoys almost ten percent of the market in Louisiana. Humana's ten largest markets are

Kentucky, Florida, Georgia, Louisiana, Wisconsin, West Virginia, Texas, Puerto Rico, Tennessee, and Ohio.

## THE DEFENDANTS' CONSPIRACY

38.     After UAS entered the market by contracting with primary care physicians, primary care physicians began treating their patients with allergy testing and allergen immunotherapy. Finally patients could receive this treatment for their seasonal and perennial allergies from their own provider, and not have to travel to a board-certified allergist for a referral. But once they started offering this treatment, established and dominant market interests started to notice and colluded together to minimize the entry of these new market participants.

39.     For example, by August 2011, Thermo Fisher, otherwise known as Phadia, which manufactures 85-90% of the allergy blood tests sold in the United States, noticed a decline in sales of those tests.  The reason for the decline was an increase in allergy skin testing performed in primary care offices by UAS and AAAPC members.  Similarly, also by August 2011, board-certified allergists had noticed in their local markets that certain primary care offices that were once a referral source for patients for allergy skin testing and immunotherapy had become competitors along with UAS.   Those allergists pleaded with their national and state trade associations to take action.

40.     The result was a "Remote Practice of Allergy Strategy" written by Tonya Winders, then the Market Development Team Leader at Thermo Fisher.  The strategy, authored in August 2011, was the product of meetings that Winders had with various board-certified allergists around the country from July to August 2011, including leaders of the three national trade associations of board-certified allergists: the American Academy of Allergy, Asthma & Immunology Society ("AAAAI"), the American College of Allergy, Asthma & Immunology

Society ("ACAAI"), and the Joint Counsel of Allergy, Asthma & Immunology ("JCAAI"). These entities referred to allergy skin testing and immunotherapy at the primary care level as the "remote practice of allergy" or "RPA."

41.     The Remote Practice of Allergy Strategy included coercing primary care physicians and practices to stop allergy skin testing and immunotherapy and thus exit the market. The means of coercion included false claims that such services offered at the primary care level were substandard, unsafe, and fraudulent and thus risked medical and legal liability. The strategy also included contacting health insurance companies, including Defendants, to convince them to stop reimbursing for such services on the same false basis.

42.     In September 2011, Thermo Fisher shared the written strategy with the Allergy & Asthma Network/Mothers of Asthmatics, Inc. ("AANMA").  AANMA is a 501(c)(3) non-profit that was originally devoted to patient advocacy, but in a plea for funds, had offered to advocate on behalf of board-certified allergists, who became most of its members.  After AANMA's receipt of the strategy, AANMA offered to be the public face of the campaign to eliminate the "remote practice of allergy" or allergy skin testing and immunotherapy at the primary care level. In exchange, AANMA sought and was paid money by both Thermo Fisher and ACAAI specifically to carry out the campaign.

43.     By 2013, the joint campaign of AANMA, AAAAI, ACAAI, JCAAI, and Thermo Fisher was in full swing.  Tonya Winders, who was formerly of Thermo Fisher, took over as the Chief Executive Officer of AANMA in February 2013.  And by April 24, 2013, AANMA published an article titled "Patients, Not Piggy Banks!" regarding UAS, AAAPC, and primary care physicinas practicing allergy testing and immunotherapy. This article was widely distributed to its members and thousands of health care professionals across the country, including BCBSLA

representatives, through a newsletter titled "Allergy & Asthma Today."  The article was also posted on the AANMA website. The article falsely warned that patients are increasingly and unknowingly exposed to "fraudulent billing schemes" of allergy testing immunotherapy practices to embed a certified allergy technician into a primary care doctor's office. AANMA targeted UAS and the physicians in contract with UAS in this article in furtherance of its conspiracy with Thermo Fisher and the specialists.

44.     In June 2013, a BCBSLA medical director, Dr. Dwight Brower, raised the issue of allergy testing and immunotherapy to the attention of the BCBSLA Medical Coding Committee ("MCC"). Dr. Brower had spoken with a local allergist—Dr. Joseph Redhead of Baton Rouge about allergy testing and immunotherapy at the primary care level.  At Dr. Brower's suggestion, the MCC agreed to limit the amount it would pay for allergy immunotherapy preparation to 100 units under CPT Code 95165. The MCC minutes noted that the legal departments would be notified and provider agreements would be updated to reflect this change in units.

45.     But BCBSLA never updated provider agreements, and BCBSLA never honored this decision to restrict physicians to 100 units. Rather, after further communications with other health insurance companies, Dr. Brower, BCBSLA, and the other members of the conspiracy decided to exclude UAS from the market.  To do so, they instead sought to pay nothing for either allergy skin testing or immunotherapy for any primary care office submitting payment, understanding that the consequence of lack of reimbursement would cause UAS and primary care physicians to exit the market.

46.     In July 2013, Dr. Brower asked his team about the perceived problem of UAS, calling it a "scheme." He asked for confirmation on the MCC's decision to restrict units for

immunotherapy and when it would become effective: "FI is telling me that we have now paid over 2 million bucks to United Allergy for this scheme. More to come on when we might deny everything outright but we need to stop the bleeding."

**BCBSLA Devises How to Restrict Competition in the Market**

47.     In July 2013, BCBSLA sought out about how to collude with its competitor insurance companies to agree to eliminate new primary care competitors in the allergy skin testing and immunotherapy markets.   Dr. Brower made notes of his meetings, which included meetings with other insurance companies and allergists.  Included in Brower's meeting notes was a notation referencing Humana stating "denies for no pass through." Dr. Brower's notes also included a reference to Donald Aaronson, who was then the Executive Director of the JCAAI, as well as "homeopathic doses are considered ineffective, but anaphylaxis risk remains."

48.     After the meeting with at least one payor in July 2013, BCBSLA considered setting a new price for allergen immunotherapy. In an email to senior leadership at BCBSLA, Brower stated:

> "After visiting Blue Cross of Texas with the FI department and learning more about United Allergy, I think the 100 units is too many. While our goal should be to deny all claims from them, we have to first work through some issues. In the meantime, I recommend that we do what BC of Tx is doing, which is limiting 95165 to 60 units (every 60 days). More to come on this, but we should fast track stopping the payment of the 300 units ASAP!"

49.     But Dr. Brower considered this a short-term solution while he worked on his plan to eliminate UAS from the market.

50.     Knowing that board-certified allergists were involved in anticompetitive conspiracies against UAS and primary care physicians, Dr. Brower met with multiple allergists to discuss how to stop reimbursing primary care for allergy skin testing and immunotherapy. For example, Dr. Brower met with a board-certified allergist named Dr. Joseph Redhead, regarding

allergy techniques and other background information on primary care practicing allergy testing and immunotherapy. Dr. Redhead falsely suggested the amount that primary care physicians were billing was excessive.

51.     In August 2013, Dr. Brower directed BCBSLA representatives to visit providers' practices to interrogate them and discourage them from contracting with UAS.  For example, that same month, BCBSLA representatives visited Dr. Billy May, a primary care physician in Baton Rouge.  Dr. May informed BCBSLA that his uncle is a board-certified allergist in Gulfport, Mississippi and he spent several summers working for his uncle—gaining an appreciation and interest in the benefits of allergy testing and allergen immunotherapy. Additionally, Dr. May described his practice including that he first starts with "avoidance" therapy (where a physician will recommend the patient avoid a particular allergen that the patient is allergic), but wanted to work with UAS because of the increased patient compliance rates and to offer the therapy to his current patients. Dr. May also prescribes an epi-pen to each one of his patients in order to begin immunotherapy, among other safeguards to ensure safety.

52.     Meanwhile, on September 18, 2013, AANMA sent a letter to the top 127 payors across the country, including BCBSLA, regarding AAAPC, UAS, and all primary care physicians in contract with UAS. AANMA wrote to Dr. William Freeman, the Medical Director at BCBSLA, who shared the letter with Dr. Brower. The letter contained numerous false representations concerning AAAPC and UAS, including that they were engaged in a "deceptive practice driving inappropriate and excessive utilization of allergy testing and immunotherapy in primary care." AANMA directed BCBSLA to a fraudulently-requested OIG opinion regarding a remote services allergy company that was formed for the purpose of impersonating UAS and receiving a negative opinion, and to eliminate reimbursement for providers that were members of

AAAPC or in contract with UAS.  This letter also directed BCBSLA to the AAAPC website, so that BCBSLA could audit, investigate, and ultimately deny payment for physicians in its network.

53.     Not long after, at BCBSLA's request, the Louisiana State Board of Medical Examiners issued a friendly subpoena for documents to BCBSLA on September 24, 2013 to produce "a list of any and all physicians that Blue Cross Blue Shield of Louisiana believes has contracted with United Allergy, including physician's address and identification numbers."

### BCBSLA and AllMED Collude to Manipulate Independent Review of Provider Appeals to Exclude UAS and Primary Care from Reimbursement

54.     Around the time BCBSLA received the letter from AANMA, Dr. Brower wrote himself an email that he later identified as an "Initial AllMed Summary" position statement. Dr. Brower devised the idea to deny all allergy testing and immunotherapy claims of the primary care providers in BCBSLA's network.  Dr. Brower decided BCBSLA would deny all the claims as not "medically necessary" even though he knew that was an inappropriate basis for denial. Because Dr. Brower knew those claims would be appealed and ultimately referred to an independently review organization ("IRO") at random, Dr. Brower devised a method to short-circuit that process and find a friendly IRO that would uphold the claims denials.

55.     On September 26, 2013, Dr. Brower drafted and sent himself via email a position statement on BCBSLA's decision to discontinue paying for services performed by providers in contract with UAS.  The draft "position statement" was intended to submit to an IRO to see if they would uphold the claims denials.  The draft position statement stated that BCBSLA has "a number of concerns about the above immunotherapy services," including that patients are often permitted to self-administer allergy shots and that the "protocol" encourages "highly diluted concentrations of the build-up injections used in this protocol." Brower based these opinions on a

discussion with a local allergist and articles drafted by AAAAI and ACAAI that allergists had proposed as a standard of care to exclude primary care physicians.

56.     Brower's draft also revealed BCBSLA's motivation was to exclude reimbursing primary care from allergy testing and immunotherapy, thereby excluding UAS. He stated, "we are researching our options to discontinue paying for these services. We prefer an administrative solution but are having to work through some legal and administrative issues to be able to accomplish this. In the meantime, we are contemplating denial of these services as not medically appropriate/necessary."

57.     Brower then stated that BCBSLA "would like to forward several cases for a board certified Allergy/Immunologist to review for an opinion on this situation. This is an informal quality/policy review at this time but would like to know the likely result if future actual appeals were sent to this reviewer based on denials of UAS services as not medically necessary." BCBSLA was requesting from an independent review organization whether it would in the future honor BCBSLA's decision to not reimburse a primary care physician's decision to put his or her patient on allergen immunotherapy. Brower included questions to this effect:

> "1. Would the reviewer uphold or overturn any future denial of 95165 services as not medically necessary that would be billed by a PCP utilizing UAS and their immunotherapy protocol?
>
> 2. Assuming the reviewer agrees with the inappropriateness of this service, would the reviewer uphold the denial of the skin testing and the few allergy injections given as related services to the inappropriate immunotherapy program? Although the prick testing appears to be fairly standard, it still is part of a flawed program, as would be the injections."

58.     Brower sent this message to AllMed to see if it would agree with BCBSLA's proposal to uphold claims denials. And after receiving the position statement, AllMed agreed that if referred such denied claims, its board-certified allergist would "uphold any future denial

of 95165 services as not medically necessary, assuming it is billed under the noted UAS immunotherapy protocol," and the "reviewer would also uphold the denial of the skin testing and applicable allergy injections, as they are a component of a flawed system."

59.     After AllMED sent its response to BCBSLA, Brower communicated with BCBSLA leadership regarding the external review "from an allergist regarding the UAS allergy immunotherapy." He stated the "volume of these claims will be problematic from a MN [medical necessity] denial/appeal resources standpoint, but that route may be our best defense from the inevitable litigation."

### BCBSLA Uses LSBME & Louisiana Allergy Society to Do Its Dirty Work in Boycotting UAS

60.     Meanwhile, in November 2013, BCBSLA continued to communicate with the LSBME to falsely suggest a "violation of the Board's rules on Dispensation of Medications." Joseph Bonck, a Board Investigator and Compliance Officer at LSBME, communicated with Kandyce Cowart of BCBSLA providing her with information on the letters sent and giving her an update on the timeframe of the letters. At the same time, BCBSLA sent letters to providers that were suspected of working with UAS notifying providers that it was "conducting reviews of claims, medical records, and billing records for allergy related services. These reviews are designed to ensure claim payments are made in accordance with contract benefits." When a payor conducts a review or an audit of a physician, that provider is inconvenienced and threatened—as the provider relies on reimbursement from the payor to pay his or her payroll and operational expenses.

61.     At the same time, in November 2013, BCBSLA also communicated with the Louisiana Allergy Society so that it could communicate with the LSBME regarding the "remote practice of allergy" in Louisiana. Theron McCormick, a board-certified allergist in Baton Rouge

and President of the Louisiana Society of Allergy, Asthma and Immunology ("LSAAI"), invited Donald Aaronson, the Executive Director of the JCAAI, to speak at the Louisiana Allergy Society meeting in June. Aaronson wrote to Dr. McCormick, "I assume you would like an update on what is going on in the regulatory arena and legislative arena that impacts allergy and allergists and their practices. The talk would be along the lines of last year's presentation but with new material, and a little review of what I covered last year that is still an issue. I did focus a lot on Remote Practice but not much has happened this year in that area so it would not be a major focus this year." Aaronson had previously spoken to the LSAAI regarding JCAAI's strategy to rid the market of UAS and McCormick was a member of RADAR, the Regional Advocacy Discussion and Response network, that was joinly formed by ACAAI, the JCAAI, and the AAAAI to attack UAS at the local level.

62.     In December 2013, Brower emailed Andrea Barrack, (BCBSLA Medical Director), Rodney Wise (BCBSLA Market Chief Medical Officer), and David Carmouche (BCBSLA Executive Vice President of External Operations and Chief Medical Officer) regarding the UAS denial "rationale." Brower stated that "[a]lthough a final decision has not been made yet, an appeal to DOI [Department of Insurance] is forcing us to make a decision on a few cases next week due to time frames." Brower stated that he recommends denying based on "not medically necessary" and provided a denial "rationale" with references to the AAAAI Joint Task Force Report. Brower noted, "Hopefully this will suffice and set the stage for the expected appeals….This will go to the member as well, and it may make some of the PCPs uncomfortable, but they deserve it on this one." Brower noted one reason for the denial was the physician's decision to allow a patient to self-administer their immunotherapy, as he stated the Joint Task Force cautioned against self-administration of allergy shots as "not appropriate under any

circumstances," and that the "risk of anaphylaxis is such that this is a significant quality issue." Though Brower stated that BCBSLA would be denying all allergy claims from primary care physicians in contract with UAS, BCBSLA would later allow other physicians to permit their patients to self-administer their allergy shots. BCBSLA sought any reason as a pretext to deny reimbursement to primary care physicians in contract with UAS.

63.    In December 2013, Cecilia Mouton, the Executive Director of the LSBME, communicated with the President of the LSAAI and a member of RADAR, Dr. Theron McCormick. In an email to McCormick, Mouton stated: "I enjoyed speaking with you this morning. The Board has directed me to investigate the issue of non-allergy trained physicians engaging in the diagnosis and treatment of allergy disorders utilizing allergy extracts." Mouton requested that someone from the LSAAI make a presentation to the Board at their upcoming January meeting.

64.    Following the email from Mouton to McCormick, McCormick forwarded the email to the JCAAI with additional information on his phone call with Mouton. McCormick stated that Mouton addressed the issue of "remote practice of allergy in our state," as it was brought to her attention by BCBSLA after they received claims from physicians working with UAS to perform allergy tests. McCormick informed the JCAAI that he was "very careful not to make any disparaging remarks about the practice and only focused on answering her questions regarding the traditional allergy testing and mixing practice," and Mouton "encouraged our society and state Allergists to continue to purpose this direction, as she stated that she will likely recommend that the 'remote' practice of allergy, by non-allergists, not be done unless approved and they are certified." Mouton also requested from McCormick the JCAAI's stance on UAS and the "remote allergy practice," and to review charts from primary care physicians.

65.     The next month, on January 14, 2014, the JCAAI submitted a statement to the LSBME with "information to assist with your investigation." The JCAAI stated "[o]ur organizations have not issued any statements or guidance related to the practice of allergy by non-allergists. We believe state and federal antitrust and restraint of trade laws restrict us in that area."

66.     Two days later, on January 16, 2014, Dr. McCormick communicated with the JCAAI again about Mouton's request for him to review medical records of primary care physicians performing allergy testing and allergen immunotherapy. He stated, "the director of LSBME has also asked me to review several medical records from non-allergist providers to obtain my opinion if they adhered to standard of care. The charts arrived today. I reluctantly agreed to review the charts last week, because I feared if I declined, she was determined to have another allergist review the charts. The charts are from practices that utilize what we term as 'Remote allergy practice.'"

**BCBSLA, Humana, BCBSKS Agree to Boycott UAS & Deny Claims**

67.     Throughout 2014, BCBSLA, Humana, BCBSKS and other competitor payors started to collaborate on how they could restrict the market for allergy skin testing and immunotherapy by eliminating those services at the primary care level.  In furtherance of these efforts, these health insurance company competitors shared reimbursement and investigation information.  They agreed that UAS's expansion was facilitating competition in the market at the primary care level and the best way to eliminate that competition was to deny all claims for reimbursement for allergy skin testing or immunotherapy submitted by any entity or person associated with UAS.

68.     These communications included an exchange of information on a database hosted by the National Health Care Anti-Fraud Association, a private organization based in Washington, D.C. ("NHCAA"). The NHCAA touts itself as the only national membership organization focused solely on health care fraud, and its membership is comprised of private health insurers, public sector law enforcement, and regulatory agencies. The NHCAA provides its members information sharing, conferences, and allows members to report health care fraud to it—as it provides a member-only login portal titled "Special Investigation Resource and Intelligence System." Health insurance companies are encouraged to report health care fraud using this system. Though the NHCAA may pride itself on preventing and stopping health care fraud and abuse, it in reality provides a mechanism for payors—who are competitors—to share information on their investigations and reimbursement decisions. Humana, BCBSKS, BCBSLA, and other payors all shared information on UAS and providers in contract with UAS and how they were each handling what the NHCAA termed a "scheme."

69.     The NHCAA also provides a "Peer Experience Resource Center" request ("PERC") where insurance company representatives can submit inquiries and other representatives respond with information and answers to their questions. The NHCAA also holds Medical Directors Advisory Calls where medical directors can "bring questions or current schemes to share." Participants on these calls have included the medical director for BCBSKS, Myron Leinwetter, who was instrumental in denying claims for primary care physicians in Kansas who were in contract with UAS. The sharing of such reimbursement information is illegal and anticompetitive under law, and the NHCAA has provided mechanisms for payors to collude and boycott UAS.

70.     In January 2014, after exchanging information with competitors, BCBSLA finally decided it would go through with shutting off reimbursement to primary care physicians who contracted with UAS as the method to drive UAS from the market.  To facilitate the strategy, BCBSLA made the decision that the Medical Review Department would take over the review of allergy claims billed by providers who contract with UAS.  BCBSLA created a "Possible Paths" document to handle the issue of primary care providers performing allergy testing and immunotherapy in contract with UAS—including its information from other payors on how they were excluding UAS and primary care from the market for allergy testing and immunotherapy. BCBSLA listed "Incident To," "CMS/Medicare Guidelines," "LSMBE – Dispensing License," "Lack of potency," "Medical necessity," and "Criminal Update" as possible paths. "Incident To" was "still not definitive" though BCBSLA stated "[i]f the services do not fall under the Incident-To provision then, the no-pass through avenue may still be viable. We are aware of other plans taking this path."

71.     For the next "possible path," "CMS/Medicare Guidelines," the policy states that the antigen must be prepared by the physician and treatment regimen must be determined by the physician, and that BCBSLA was aware that United Healthcare has a policy that follows the above CMS/Medicare guideline. Next, BCBSLA listed "LSBME – Dispensing License" as another "possible path," following their communications and encouragement for the LSBME to investigate and stop primary care from working with UAS. BCBSLA was already speaking to other payors about how they were handling primary care and UAS in the market; BCBSLA and other payors were sharing investigation and reimbursement information—through illegal and anticompetitive communications.

72.     Meanwhile, also in January 2014, BCBSKS decided to pursue the same strategy. That month, BCBSKS also began contacting primary care providers they suspected of working with UAS. BCBSKS representatives visited providers' offices and interrogated them about their contract with UAS and the protocol used for allergy testing and immunotherapy. When the provider informed them of the protocol and the contract, BCBSKS representatives encouraged the provider to stop working with UAS and threatened that if they did work with UAS, each patient would have to sign a waiver that the service would not be covered. BCBSKS had not yet implemented an official policy or sent a denial letter regarding allergy claims to these providers. Rather, BCBSKS began intimidating providers with threatening information to encourage them to cease doing business with UAS and providing this treatment to their patients. Additionally at this time, BCBSKS representatives asked providers for their agreements with UAS—as they informed them they had a version of an agreement with a provider in Texas, but not in Kansas.

73.     Counsel for primary care physicians contacted BCBSKS to clarify and explain the miscommunication on the services performed by primary care physicians in contract with UAS.

Stacy Jeffress, counsel for BCBSKS, communicated with counsel for the primary care physicians and informed him that BCBSKS had "ample documentation which establishes that UAL employees (the Clinical Allergy Technicians or Specialists) perform the skin prick testing, prepare the antigen/immunotherapy, teach patients to administer the injections, and perhaps even administer injections." When counsel for the primary care physicians asked why Jeffress used "UAL" instead of "UAS" and for a copy of the documentation, Jeffress refused.

74.     The next month, in February 2014, BCBSKS ramped up its efforts to intimidate providers and scare them from working with UAS. BCBSKS continued to speak to providers— though many were then represented by counsel—and sent a notification to all suspected providers regarding UAS. The letter stated:

> "You may recently have received a letter and documentation checklist from United Allergy Services stating that it had reached an agreement with Blue Cross and Blue Shield of Kansas (BCBSKS) regarding payment for allergy services. Contrary to United Allergy's assertion, no such agreement has been reached.
>
> Services provided by United Allergy's technicians are not eligible for payment. BCBSKS only allows claims for services performed by eligible providers. It is evident even from United Allergy's checklist that the skin prick testing, allergen formulation, etc., are performed by their technician employees and not by eligible BCBSKS providers."

75.     The letter was signed by Robyn Goates, the Manager of Professional Relations at BCBSKS. Goates instructed the BCBSKS staff to approach providers and discourage them from working with UAS. As the providers receive the vast majority of their reimbursement from BCBSKS, many terminated their contracts with UAS after BCBSKS continued to contact them.

76.     Humana also agreed to pursue the same strategy at the same time.  In February 2014, Humana began contacting providers through audits, investigations, overpayment notices, and threats of being kicked out of the network for alleged violations of their physician agreements with Humana by performing what Humana termed "pass-through billing" of allergy

services. Humana contacted providers in Texas, Tennessee, South Carolina, Ohio, Kentucky, Colorado, and Arkansas.

77.     One provider in Lexington, Kentucky, Van Bussum Family Practice, PSC, wrote to its patients that because of Humana's threat of kicking the providers out of the network and its overpayment notices, the practice was having to not only close its allergy clinic and cease performing allergy-related services, but also close the practice entirely.  Humana had sent Dr. Van Bussum a refund request for over $25,000. Dr. Van Bussum wrote to his patients that his practice was unable to pay UAS or Humana if they are not reimbursed for the services, and that this threat "may very well bankrupt the practice." Dr. Van Bussum had previously been paid by Humana for allergy-related services, including allergy testing and allergen immunotherapy, for a year before Humana suddenly stopped paying.

78.     In February 2014, UAS communicated with BCBSLA to discuss the role that UAS plays in facilitating allergy testing and allergen immunotherapy for primary care physicians in Louisiana. UAS met with BCBSLA and sent information on the protocol that primary care physicians use when working with UAS; unfortunately, though, BCBSLA had already determined to exclude UAS from the market, and continued with its plans to stop reimbursement.

79.     Nevertheless, BCBSLA decided that it would deny all claims as "medically necessary" even though it knew it was a false basis to do so.  And on February 7, 2014, Dr. Brower sent the "BCBSLA Position Statement for UAS appeals" to the medical appeals team with instructions: "The following statement should be included on any specialty matched appeal on our denial of UAS allergen immunotherapy claims. Use a board certified allergists and enter this as additional information on the portal with each appeal, in addition to the usual information. For now, send these to me for the initial review, so I can keep up with the cases, and use

AllMED." By specifically instructing his team to only use AllMED—the independent review organization that BCBSLA had already agreed on its stance on denying the appeals, BCBSLA intentionally circumvented the random assignment of claims denials to an "independent" review organization knowing the result before they were ever assigned.  BCBSLA concealed this fraud by only telling the providers who appealed their claims that they would be assigned to an IRO, and intentionally withholding information that the claims would all be assigned to the same IRO, AllMED, who had already agreed to uphold the denials.

80.     Also in February 2014, BCBSKS began investigating and denying claims for allergy testing and allergen immunotherapy for primary care physicians in contract with UAS. BCBSKS requested additional information from the provider through medical records, and the providers all provided such records. Additionally, the providers began requesting the first level of appeal, a retrospective review, based on BCBSKS's appeal procedures.

81.     But though the individual providers were represented by counsel and UAS attempted to communicate with BCBSKS about its sudden refusal to reimburse primary care physicians practicing allergy testing and allergen immunotherapy, BCBSKS was already communicating with other payors and providers in contract with UAS discouraging them from working with UAS.

82.     Just as BCBSLA had done, BCBSKS started denying the claims as "NMN" or the false statement that the claims were not medically necessary. According to BCBSKS Medical Director, Myron Leinwetter, DO, who was also a member and participant in NHCAA communications where payors would share information on UAS and primary care physicians in contract with UAS, BCBSKS denied the claims based on an additional consultant review that allergy testing was not medically necessary, and therefore, immunotherapy was also denied as

not medically necessary. In addition, BCBSKS denied based on the rationale that the services were provided by an ineligible provider.

83.     Before this sudden reversal of BCBSKS's consistent payment for allergy testing and allergen immunotherapy, even BCBSKS communicated with UAS directly on the protocol and dosing of immunotherapy. For example, in May 2013, Kyle Abbott, a BCBSKS Professional Relations Senior Representative, communicated with a clinical allergy specialist for Concierge Medicine of Wichita, a primary care practice in Wichita, Kansas. Abbott asked the clinical allergy specialist for information on how many doses the immunotherapy provides over the course of the year and when he found out the provider was billing for fewer than the actual doses, Abbott informed the clinical allergy specialist that they were actually making less money than they could based on the actual dose amount. Only after BCBSKS started communicating with Defendants and other payors and agreed to investigate and then halt reimbursement for primary care physicians in contract with UAS did they suddenly stop paying.

84.     The next month, in March 2014, the medical director at BCBSKS, Myron Leinwetter, contacted a primary care physician regarding UAS. He asked her if she had been approached by UAS, a company that had been identified as a fraudulent company in other states. Leinwetter informed the primary care physician that BCBSKS would not work with UAS or reimburse claims submitted by primary care physicians in contract with UAS because the technician was actually the provider for services, UAS encourages self-administration of allergy shots, and that the services are very expensive. Leinwetter encouraged the primary care physician to share the information on UAS and to contact him if they have questions. The next day, Leinwetter emailed the primary care physician again after speaking with BCBSKS legal, and requested the primary care physician to not share the message with other providers.

85.     The same month, in March 2014, primary care physicians sent BCBSKS a letter to explain and clarify that the services performed were performed by the provider and not the UAS clinical allergy technician. Additionally, the letter attached engagement letters signed by each of the providers for legal representation. Following this letter, BCBSKS continued to communicate with providers, interrogating them on whether they knew their legal counsel and discouraging them from working with UAS. Counsel for the primary care physicians wrote to BCBSKS again alerting BCBSKS to the inappropriate behavior of its staff in continuing to communicate with providers separate and apart from legal counsel.

86.     In March 2014, Brower gave directives in the Medical Review department to flag certain providers known to be in contract with UAS. Liz Nassar, a member of the BCBSLA Medical Review department, emailed the rest of the team stating "[t]hough there is no medical policy related to this issue it was the only means to get the claims to pend for Medical Review." She stated that the physician was "having blood drawn from the member for above and submitting to UAS labs for them to develop antigen extract. The allergen extract is then sent to the MD office for the member to learn self-administration. The MD does the billing rather than UAS labs." Though Nassar's email wrongly described the protocol of primary care physicians performing allergy testing and allergen immunotherapy (as they utilize a skin prick test and mix the immunotherapy in their medical practice facility), BCBSLA was flagging all known providers to deny any allergy claims performed by those providers.

87.     That same month, in March 2014, Humana continued to threaten providers that it would kick them out of the network and that it would recoup overpayment amounts for immunotherapy. Dr. Van Bussum, a provider in Kentucky who received such notices from Humana, pleaded with Humana to not seek all overpayments—which would inevitably bankrupt

his practice. Humana informed the provider that if the practice ceased doing business with UAS and signed on with another allergy-services company, that Humana would then verify that the technician works for the practice and not UAS and would "remove the red flag" on the practice's claims. Humana agreed to drop the overpayment notice to the provider, but informed the provider that it could no longer do business with UAS in order to receive reimbursement for his claims. Dr. Van Bussum terminated his contract with UAS following this appeal of his claims.

88.     As part of the conspiracy to exclude and harm UAS and primary care physicians practicing allergy testing and immunotherapy, that same month, in March 2014, Kandyce Cowart of BCBSLA contacted the special agent who had been working on an investigation relating to a *qui tam* filed by board-certified allergists in Texas. Though various Texas board-certified allergists and their trade association, the Texas Allergy, Asthma and Immunology Society ("TAAIS") had previously been permanently enjoined from disparaging UAS and communicating with payors about not reimbursing primary care physicians in contract with UAS, various individual board-certified allergists instead turned to the government to attempt to shut them down from practicing allergy services. BCBSLA was also motivated to work with the government to attempt to exclude UAS, as they continued to similarly use the LSBME to do their dirty work and then communicate with the FBI and OPM regarding their investigation after the board-certified allergists filed a *qui tam* lawsuit in Texas. Misty Jones of BCBSLA sent information to the special agent investigating UAS on April 10, 2014.  Despite BCBSLA's urging to the contrary, the FBI and OPM ultimately ended their investigations later after they found no wrongful conduct.

89.     In April 2014, AANMA, who was also pushing the same false investigation, published another article to defame and harm UAS, AAAPC, and all primary care physicians

36

practicing allergy testing and allergen immunotherapy by publishing "Deception and Fraud in Allergy Care." Like its last article, the defamatory article was sent to payors around the country as part of the "Allergy & Asthma Today" publication and posted on AANMA's website. Such publication was shared with third-party payors by co-conspirators like Thermo Fisher to convince them to not reimburse primary care physicians offering allergy skin testing and allergen immunotherapy with UAS.

90.     In May 2014, UAS and Humana held a conference call for a clinical meeting to discuss the UAS protocol. UAS explained to Humana that primary care physicians in contract with UAS do not perform sublingual immunotherapy, Humana is not billed for self-administration of allergy shots—if the provider permits appropriate patients to self-administer their shots, and that each provider provides all services and such services are not "pass-through billing."

91.     Between April and September 2014, AllMED completed its external review of the final level of provider appeals following BCBSLA's denials of their claims. As AllMED promised and agreed with Dr. Brower and BCBSLA, an allegist performed each of the external reviews and AllMED denied each and every appeal based on "not medically necessary." Before AllMED sent some of the reviews back to BCBSLA, Dr. Brower contacted the Executive Medical Director for AllMED, Skip Freedman, MD, to discuss the specific "UAS cases" and the "bigger picture of these coming back," among other items. In AllMED's decisions, the specialty reviewers consistently relied on the "position statement" prepared by Brower and BCBSLA as well as "practice parameter" documents prepared by allergy trade associations—including the TAAIS and the AAAAI. These allergy trade associations were co-conspirators and

communicated with payors to restrict reimbursement for allergy testing and allergen immunotherapy to specialists only by promulgating a false "standard of care."

92.     In May 2014, Diana SeGall, who is a registered nurse in the BCBSLA medical appeals and clinical affairs department, emailed Dr. Brower regarding the reviews being sent to AllMED and Brower's insistence on using a specialist: "You instructed 'Send this case to an allergist for an external specialty matched review of our denial. Include our position statement on UAS'… This is OGB & it doesn't require specialty match on Level 1 appeal…just checking to see if you still want that sent." Brower responded: "I want all OGB UAS first level appeals to go out to an allergist." OGB is the Office of Group Benefits, which covers more than 200,000 state employees in Louisiana. BCBSLA administers the claims for OGB under a contract worth about $35 million per year. BCBSLA recently won the contract—the largest contract in the state.

93.     In June 2014, frustrated with denied claims and BCBSLA sending letters directly to patients and not providers about BCBSLA's decision to deny claims, a primary care physician working with UAS requested a "peer to peer" for denial of claims for allergy testing. But BCBSLA refused to provide a peer review and instead continued to request a "specialty matched appeal."

94.     In June 2014, the medical appeals staff at BCBSKS prepared for additional appeal litigation from primary care physicians in contract with UAS, as representatives of BCBSKS admitted that their handling of the appeals process was "not handled accurately."

95.     In July 2014, after having no success in speaking to BCBSLA directly after denied claims and lost appeals from AllMED, UAS requested a meeting with Jim Donelon, the Commissioner of the Louisiana Department of Insurance. Commissioner Donelon requested the attendance of Sheldon Faulk and Drs. Brower and Carmouche from BCBSLA.

96.     In preparation for the meeting, BCBSLA attempted any mechanism to convince Commissioner Donelon to agree with BCBSLA and shut primary care and UAS from the market. At Dr. Brower's direction, BCBSLA contacted its co-conspirators and other competitor payors to discuss reimbursement of primary care physicians who performed allergy testing and immunotherapy and ensure that their agreement to exclude primary care from the market was being kept. Latisha Mire, the Manager of the Financial Investigations Office at BCBSLA, contacted various competitors to inquire about reimbursement and disparage UAS. Mire contacted Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Florida, Blue Cross Blue Shield of Kansas, Blue Cross Blue Shield of Georgia, Arkansas Blue Cross and Blue Shield, Optum Health, Tufts Health, Aetna, WellPoint, and Humana.

97.     David Popik, the Director of FWA Operations at Florida Blue, responded to Mire and stated that they do not receive claims from UAS.

98.     Amy Lang, a Senior Investigator at Blue Cross Blue Shield of Georgia, communicated with BCBSLA that they had to implement a new policy against sublingual immunotherapy ("SLIT"), but had to continue paying because they could not deny claims based on medical necessity.

99.     Christa Jewsbury, the Director of the Special Investigations Unit at Humana, called Mire and requested a phone conference to discuss Mire's message about UAS. Mire and Jewsbury spoke about UAS and their methods of excluding primary care and UAS from the conspiracy, and following the call, Misty Jones of BCBSLA contacted special agent Bradley Cooper. She stated, "Below is the contact person for Humana. She asked that I forward her contact information to you as they have an open investigation on UAS and would like to speak to you about what they have uncovered on this company as well as their dollar exposure."

100.     Misty Jones of BCBSLA spoke to Marguerite Mzhickteno with BCBS Kansas regarding UAS and primary care physicians in contract with UAS. Mzhickteno informed Jones that they were rejecting claims based on pass through billing, and informed Jones that Highmark Blue Cross Blue Shield was rejecting claims as well and for Jones to reach out to Earl Bock of Highmark for additional information. Mzhickteno also contacted Mire and stated that BCBSKS is "denying services because they are being performed by a non employee of the physician rendering them ineligible." Further, Mzhickteno said that they would "help in any way they can."

101.     At the meeting with Commissioner Donelon, Brower boasted that every single claim that had been appealed had been upheld on independent review, a false and misleading statement considering the circumstances. Dr. Brower intentionally withheld telling UAS or the Commissioner that all of the appeals were upheld by AllMed, who agreed to do so beforehand.

102.     Around the same time, in the summer of 2014, counsel for UAS contacted Humana about its denial of claims for primary care physicians in contract with UAS. Humana admitted to counsel for UAS that it had spoken to other competitor payors regarding investigations and reimbursement of allergy-related services, stating that it should not have to pay if other payors similarly do not pay.

103.     In August 2014, the LSBME communicated to BCBSLA that "they do not have a stance." Rather, LSBME investigator Joe Bonck informed Misty Jones with BCBSLA that the Board's "main concern is making sure that the physicians are in compliance with the dispensing rules and that the physicians are following the act of dispensing according to the decision made by the attorney general's office."

104.     In September 2014, UAS and providers in contract with UAS attempted to communicate again with BCBSLA by writing a letter to Sheldon Faulk, Deputy General Counsel

and Assistant Secretary of BCBSLA. In that letter, UAS and the providers alerted Faulk to the group boycott against them by board-certified allergists persuading carriers to adopt a false "standard of care" in order to restrict competition in the market. Little did UAS and the providers know that BCBSLA was in communication with board-certified allergists and other payors to help and lead the effort to exclude UAS and primary care from the market. Only through discovery in that federal antitrust action did Plaintiffs understand BCBSLA and the other payors' roles in the group boycott.

105.    The next month, in October 2014, UAS and primary care providers wrote to Humana to explain that providers were not engaged in "pass-through billing." Humana did not respond and continued to deny claims for allergy-related services.

106.    When UAS and the providers also did not receive a response and the providers' appeals were all denied by BCBSLA, the providers and UAS escalated the issue to the Office of the Louisiana Attorney General. They wrote in November 2014 to James D. "Buddy" Caldwell, the then Attorney General of Louisiana, regarding BCBSLA's illegal activity in excluding primary care physicians and UAS from the market.  Plaintiffs also requested a "Market Conduct Examination" on BCBSLA's business practices to ensure third-party payors conducted business fairly and responsibly. Plaintiffs did not receive the market conduct examination from the Attorney General's office.

107.    In December 2014, BCBSLA received complaints from board-certified allergists regarding BCBSLA's decision to limit the number of units for allergen immunotherapy. When the Director of Professional Reimbursement and Medical Coding, Katherine Crosby, CPA, CPC, responded to the request, she asked first for the name of the provider so that she could look at the claims. Crosby and Merle Francis, the BCBSLA Director of Network Administration, discussed

the claims and the inquiry from the board-certified allergists, and responded that BCBSLA needed to explain to providers how to bill CPT Code 95165 as it could create confusion. Francis stated in her email: "For example, if the provider is administering a 12 antigen vial, with 6 doses the provider would bill 6 units. If the provider prepares the same 12 antigen vial with 6 do[s]es in each vial, and gives the member 3 vials to self-administer, the provider would bill 18 units (3X6) number of vials times the number of doses in each vial." BCBSLA allowed providers to permit their patients to self-administer their allergy shots, but punished providers in contract with UAS to do the same.

108.    Brower responded to Francis's email with additional explanation:

"As I recall, the limit of 60 units on 95165 was our initial stop gap measure to stop the bleeding on the 300 unit claims flying through and paying. We subsequently started manually reviewing the claims from an FI list of about 70 physicians who were known to be submitting UAS claims. This edit is in place now although I am not sure if anyone is "updating" the list. The volume of this has died down significantly since the DOI meeting and our winning all of our external reviews. Theoretically, we could drop the limit unit at this time. However, it would probably be wiser to just raise the limit to 75 or no more than 100 if the 60 limit seems to be catching some legitimate allergy claims."

109.    Crosby responded to Brower's email asking how he wanted to handle this particular provider's claims for more than 60 units. She asked, "How [do] you want to handle 'auditing' this policy before we randomly change the units? We are running claims." The next day, after speaking with Brower, Crosby instructed Francis to increase the units to 75 on CPT Code 95165 "as per discussions with Dr. Brower." BCBSLA changed its policy without any process or notification to providers. Because BCBSLA thought the bleeding was over, after it created a list of "known" physicians to manually reject their claims and was victorious in using AllMED to fraudulently win every appeal, primary care physicians in contract with UAS and UAS were excluded from the Louisiana market for allergy testing and allergen immunotherapy.

But other providers could continue to bill more than 60 units and permit their patients to self-administer their allergy shots.

110.    On May 22, 2015, UAS again wrote to Humana seeking to clarify Humana's position on "pass-through billing" as its rationale for denying claims for reimbursement for primary care physicians in contract with UAS. Humana did not respond to the letter, and does not pay for such services. Providers in contract with UAS have stopped offering allergy services for members who are insured by Humana and many of the providers terminated their agreements with UAS, causing UAS to exit numerous markets around the country.

111.    BCBSLA continued to exclude UAS and primary care physicians from practicing allergy testing and allergen immunotherapy, which eventually led to termination of all of UAS's contracts with medical practices in Louisiana as UAS was forced to exit the state. And in June 2015, Marlee Ryan, a BCBSLA representative in medical appeals, contacted Brower regarding an appeal of a May 2014 claim for 300 units of immunotherapy. Brower asked if the appeal was "out of timeframe," and Ryan responded that it was in timeframe and medical review denied it. Brower responded, "Ok. At least it is an old claim. Shutting down UAS has been one of my few accomplishments of late, and I was hoping we weren't seeing another round of this scam. Thanks."

### Consumers and Plaintiffs Have Been Damaged By Defendants' Actions

112.    Third-party payors like BCBSLA, BCBSKS, and Humana are meant to deliver health care to their member patients. Their networks and care systems are implemented to ensure that each member receives high quality, comprehensive health care services in the member's local community that he or she needs. Primary care physicians are vital in that care. For allergy and asthma services, with fewer than 3000 board-certified allergists in the country, patients rely on their family physicians and pediatricians to perform these necessary services.

113.    Further, nothing prevents primary care physicians from providing allergy treatment and immunotherapy to their patients—except for when third-party payors like Defendants enact illegal policies that restrict reimbursement for their services.  A specialist certification is not required by the standard of care.  Indeed, CMS held in 1989 that allergy testing and immunotherapy is within the scope of a family physician and thus pays for allergy testing and allergen immunotherapy for primary care physicians, as do Medicaid plans administered by each individual state.  CMS pays for allergy testing and immunotherapy performed by primary care providers.  And the Patient Protection and Affordable Care Act has more recently prohibited all health insurance companies, including commercial health insurance companies like Defendants, from discriminating on who it will reimburse on the basis of license or certification.

114.    Despite this clear direction in the law, Defendants, along with other co-conspirators including payors, Thermo Fisher, AANMA, and board-certified allergists and their trade associations, have suggested that primary care physicians are incapable of providing allergy testing and allergen immunotherapy to their patients and were determined to shut primary care physicians and businesses like UAS out of the market. They have been successful in their markets, as providers have not been able to be reimbursed for these services since Defendants took actions to exclude them from the market. Consequently, this means that for patients in the states and local markets where BCBSLA, BCBSKS, and Humana insure patients, they are left with no choice and cannot receive this treatment.

115.    Around the time that BCBSTX and BCBSLA discussed how to handle claims from primary care physicians in contract with UAS, they began communicating with other payors to stop reimbursement nationally to eliminate them from the market. BCBSLA's

collaboration indeed had the intended effect in damaging UAS and primary care: Humana and BCBSKS, among other payors, began to take action against UAS and stopped paying. Humana discovered UAS was doing business across the nation, and it began auditing primary care physicians, threatening to kick them out of the network, and halting reimbursement for all claims. Attempts to work with Humana were rebuffed, as it claimed on numerous occasions that its competitors also did not pay UAS's physicians on the basis of "pass through billing." Humana ultimately went to individual providers agreeing to drop the claims for recoupment in exchange for their agreement to terminate their agreements with UAS.

116.    BCBSKS engaged in similar conduct in 2014, denying claims on the basis of "pass through billing" and also claiming that no payor paid for these services. BCBSKS also sent representatives to providers' offices to visit with providers in person to tell them they should not communicate with UAS or its counsel, in addition to encouraging them to terminate their agreements with UAS—which effectively ended all communications with those physicians and necessitated departure from the state.

117.    Ultimately the toll of BCBSLA's activities resulted in UAS withdrawing from the state and primary care physicians not offering this important treatment for their patients. Brower took pride in this result, stating "shutting down UAS has been one of my few accomplishments as of late."

118.    The Defendants' policy changes and changes in reimbursement were intended to and, indeed did, reduce the provision of medically necessary allergy care to their covered patients.   By restricting the number of doctors in their networks who are eligible to be reimbursed for allergy care, fewer patients have been provided medically necessary allergy treatment, resulting in higher costs to cope with conditions caused by allergic rhinitis and other

conditions that could be treated with immunotherapy.  The result of the Defendants' actions have been disastrous for not only Plaintiffs' and primary care providers, but for their patients as well. Members in Louisiana, Kansas, and in the local markets where Humana insures patients cannot all see specialists for this care, and the providers have lost money, have fought with these insurance companies to stay in the network, and have not been able to provide this care that made a significant impact on their patients' lives. Moreover, the fortunate patient who may be able to obtain allergy testing and immunotherapy services from a specialist, or an allergy blood test sold by Thermo Fisher, pay higher prices for those services than they would absent the exclusion of UAS and primary care physician from the market.  They also pay more in terms of expenses associated with higher co-pays, longer wait times, longer travel distances, and additional lost days from work and school.

119.    UAS has been damaged, and will continue to be damaged, by actions taken by the Defendants to boycott, price fix, and restrict competition and output from UAS.  As a direct result of Defendants' actions, UAS has lost revenue and corresponding profits that they would have generated but for the actions of Defendants, including through termination of hundreds of contracts with medical practices.  UAS have also been forced to expend substantial resources to ensure that those it does business with do not terminate existing agreements and have also experienced difficulty in entering into business relationships with others because of Defendants' anticompetitive policies excluding them from the market. Additionally, as demonstrated by the above facts, the Defendants campaigned with other third-party payors to insist on policies that exclude UAS and physicians in contract with UAS, like AAAPC members, from the market. UAS has been damaged by questions and resistance from its existing physician and practice group partners as well as from prospective business partners, insurance companies, and

consumers.  The result has been most noticeable in terms of lost revenue and corresponding lost profits for services that would have otherwise been provided by the physicians for the benefit of their patients.  The lost revenue and profits are determined both by a decrease in services to existing contractual relationships with physicians, as well as loss of expected revenue and profit from new contracts that did not materialize.  This has also caused a loss of value and goodwill to UAS's business.

120.    AAAPC member providers have suffered significant irreparable harm to their practices and businesses, which includes damage to their reputation and wrongful interference with their medical judgment and their patient relationships.

## COUNT ONE

### SHERMAN ACT § 1 VIOLATION

**(Contract, Combination, or Conspiracy in Restraint of Trade
In Violation of Sherman Act, Section 1)**

121.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

122.    At all times relevant to the Complaint, Defendants have combined and conspired amongst themselves and other competitors, and with competitors of Plaintiffs and other third parties, to restrict competition for allergy testing and immunotherapy services in CBSAs where Defendants operate, including CBSAs in Louisiana, Kansas, and other states throughout the nation. Defendants' actions include restricting participation in the market for all physician and non-physician services provided by primary care physicians and UAS.  In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated campaign to boycott UAS to drive it from the market.  The campaign has included joint decisions not to pay for any allergy skin testing or immunotherapy service in which UAS or primary care physicians are involved,

including by falsely suggesting those services or "not medically necessary" or are "pass through billing." Defendants have also attempted to intimidate physicians not to do business with UAS by falsely suggesting they are engaged in fraud or substandard care, and have attempted to push governmental investigators into false investigations to increase the appearance of that threat. are In furtherance of its conspiracies and illegal agreements, Defendants have engaged in contact with competitor payors, physicians, other third parties in an attempt to persuade, entice, or coerce them not to do business with UAS, or to fix prices to competitively disadvantage UAS and primary care physicians to discourage competition in the market.

123.    The result of these actions is an illegal *per se* boycott and price fixing scheme that has successfully eliminated and restricted Plaintiffs' ability to market and provide allergy testing and immunotherapy services in CBSAs throughout Louisiana, Kansas, and other CBSAs where Humana does business.   Defendants BCBSLA, BCBSKS, and Humana, are horizontal competitors that hold a dominant position in the market for patients seeking allergy testing and immunotherapy, especially in Louisiana and Kansas.  Defendants have conspired together and engaged in joint collaborative action to destroy its legitimate competition by encouraging a group boycott and fixing prices in an attempt to drive UAS out of the market. By refusing to pay anything for allergy testing and immunotherapy services and coercing primary care physicians to stop working with UAS, Defendants have denied UAS the ability to compete in the market. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so Defendants should not escape a *per se* designation.

124.    Strictly in the alternative to a *per se* designation, Defendants' anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis.  The agreements Defendants have entered, maintained, renewed and enforced have had the purpose

and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy services.  As the result of Defendants' conduct, consumers have been deprived of the competition facilitated by UAS's participation in the allergy services market, leaving many consumers with less access to care, lower output, and higher prices.

125.   Defendants' conspiracy to eliminate UAS from the markets for allergy testing and immunotherapy services has involved numerous acts in furtherance of their antitrust conspiracy, including the joint decisions to deny all payments of all claims beginning in February 2014.

126.   As a direct and proximate result of Defendants' past and continuing violations of the Sherman Act, UAS has suffered injury and damages in an amount to be proved at trial.

127.   UAS also seeks money damages from Defendants jointly and severally for these violations. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

128.   Plaintiffs also seek injunctive relief.   The violations set forth above are continuing, are causing irreparable harm, and will continue unless injunctive relief is granted.

129.   Plaintiffs also seeks recovery of their attorneys' fees under the Clayton Act as a remedy for the costs they have incurred as a result of Defendants' conduct.

## COUNT TWO

### SHERMAN ACT § 2 VIOLATION
### AGAINST BCBSKS, BCBSLA, AND HUMANA

**(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
For Private Health Insurance in Violation of Sherman Act, Section 2)**

130.   Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

131.    The Defendants together have market power in Louisiana and Kansas in the commercial health insurance markets. This monopoly power is evidenced by, among other things, BCBSLA and BCBSKS's high market share of the commercial health insurance market in the CBSAs in Kansas and Louisiana, including their increasing market share and increased premiums. At all times relevant to the Complaint, Defendants have combined and conspired amongst themselves and with competitors of Plaintiffs to eliminate the competition of primary care physicians contracting with UAS to perform allergy skin testing and immunotherapy services for patients in Louisiana, Kansas—to maintain, enhance and solidify their monopoly over the insurance markets without losing market share to their competitors. Defendants' actions include restricting participation in the market for all physician and non-physician services provided by primary care physicians and UAS by restricting output, fixing prices, and discriminating against primary care physicians practicing within their license and ensuring Defendants' competitors would not take market share in the process.  In furtherance of their conspiracy, Defendants have agreed to engage in a coordinated campaign to restrict competition by discouraging primary care physicians from the practice of allergy skin testing and immunotherapy with UAS, by targeting the physicians themselves through audits, investigations, kicking them out of networks, etc., and by reducing and restricting reimbursement and cutting them out of the market for allergy testing and allergen immunotherapy. Defendants have enacted policies that in effect exclude these providers and UAS from the market and eliminate a patient's choice in seeking these services, permitting Defendants to charge higher prices and provide less services to their members. In furtherance of their anticompetitive conduct, Defendants have engaged in and encouraged contact with physicians, other payors, and other co-conspirators in an attempt to persuade, entice, or coerce them not to do business with these primary care physicians

who contract with UAS, or to fix prices to competitively disadvantage these competitors to discourage competition in the allergy services market.

132.   The Defendants have abused and continue to abuse their monopoly power to maintain and enhance their market dominance by unreasonably restraining trade and output, fixing prices for allergy testing and allergen immunotherapy, and artificially inflating their premiums they charge to consumers. Each of the Defendants' conspiracies and agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to maintaining and enlarging Defendants' market power through CBSAs in Louisiana and Kansas; allowing the Defendants to supra-competitively raise the premiums charged to consumers by inflated, unreasonable, anticompetitive amounts; depriving Plaintiffs and consumers in Louisiana and Kansas open and free competition in commercial health insurance for allergy testing and allergen immunotherapy.

133.   The Defendants' conduct constitutes unlawful monopolization and unlawful anticompetitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

134.   As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and consumers have suffered injury and damages in an amount to be proven at trial. Plaintiffs seek money damages from the Defendants for their violations of Section 2 of the Sherman Act.

## INJUNCTIVE RELIEF

135.   Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

136.     Plaintiffs request that upon judgment in this cause, the Court permanently enjoin Defendants, their agents, servants, employees, and all persons acting under, and in concert with, or for them from (i) enforcing any policy prohibiting either the provision of allergy testing or immunotherapy by primary care physicians or the blanket denial of claims for those services performed by primary care physicians in contract with UAS; (ii) contacting independent review organizations in advance with a position statement and determination of a provider's appeal, and manipulating the appeals procedure and independent review process of providers' claims; and (iii) threatening to recoup, offset or terminate any network agreements in retaliation for primary care physicians providing such services or working with UAS.

## LIMITATIONS

137.     With respect to any defense based on statute of limitations, Plaintiffs assert that such defense is barred by such tolling or deferred accrual doctrines as the discovery rule, fraudulent concealment, the continuing tort doctrine and the continuing violations doctrine.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury pursuant to FED. R. CIV. P. 38(b) of all issues triable of right by jury.

## PRAYER FOR RELIEF

Therefore, Plaintiffs demand judgment as follows:

a.     Adjudge and declare that Defendants have engaged in unlawful conduct in violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

b.     Preliminarily and permanently enjoin Defendants from violating Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2.

c.     Against all Defendants, jointly and severally, award UAS damages in an amount to be proved at trial, to be trebled with interest.

d.     Against all Defendants, jointly and severally, award UAS exemplary and statutory damages in an amount to be proven at trial.

e.     Against all Defendants, jointly and severally, award Plaintiffs their attorney's fees and costs of this suit; and

f.     Award such other further relief as the Court deems just and proper.

DATED:  January 12, 2018.

Respectfully submitted,

**OTTINGER HEBERT, L.L.C.**

By:  /s/ William H. L. Kaufman

    Patrick S. Ottinger
    State Bar No. 08727
    William H. L. Kaufman
    State Bar No. 29929
    J. Michael Fussell, Jr.
    State Bar No. 29870
    1313 West Pinhook Road (70503)
    P. O. Drawer 52606
    Lafayette, Louisiana  70505-2606
    Telephone:  (337) 232-2606
    Facsimile:  (337) 232-9867
    psottinger@ohllc.com
    whkaufman@ohllc.com
    mfussell@ohllc.com


*Pro Hac Vice* Application to be Filed:

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

    Casey Low
    Texas Bar No. 24041363
    Dillon J. Ferguson
    State Bar No. 06911700
    Benjamin L. Bernell
    Texas Bar No: 24059451
    Liz Kozlow Marcum
    Texas Bar No: 24078801
    401 Congress Ave., Suite 1700
    Joshua T. Wackerly
    Texas Bar No. 24093311
    Austin, Texas 78701-4061
    Phone: (512) 580-9600
    Fax:    (512) 580-9601
    casey.low@pillsburylaw.com
    Dillon.ferguson@pillsburylaw.com
    ben.bernell@pillsburylaw.com
    liz.marcum@pillsburylaw.com
    josh.wackerly@pillsburylaw.com


**ATTORNEYS FOR PLAINTIFFS**