| | |
|---|---|
| ACADEMY OF ALLERGY & ASTHMA IN PRIMARY CARE, ET AL. | CIVIL ACTION |
| VERSUS | No. 18-399 |
| LOUISIANA HEALTH SERVICE AND INDEMNITY COMPANY, ET AL. | SECTION: "J"(2) |

## ORDER AND REASONS

Before the Court is a *Motion to Disqualify Counsel of Record* **(Rec. Doc. 57)** filed by Plaintiff, United Biologics, L.L.C. d/b/a United Allergy Services. Defendants, Louisiana Health Service and Indemnity Company d/b/a Blue Cross Blue Shield of Louisiana and Allmed Healthcare Management, Inc., have jointly filed an opposition (Rec. Doc. 76), arguing against disqualification of their counsel, Baker Donelson Bearman Caldwell & Berkowitz, P.C. Movant responded with a reply (Rec. Doc. 87) to which Defendants responded in a supplemental opposition (Rec. Doc. 88). Having considered the Motion and legal memoranda, the record, the Parties' arguments at oral argument, and the applicable law, the Court finds that the Motion should be **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

According to Plaintiffs' complaint, this "case concerns a conspiracy and agreement among various health insurance company competitors . . . to restrict

1

competition in the relevant markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies . . . in local areas throughout Louisiana, Kansas, and other local markets serviced by Humana." (Rec Doc. 1 at 1-2). Plaintiffs are Academy of Allergy & Asthma in Primary Care (the "Academy") and United Allergy Services ("UAS").

The Academy describes itself as "a 504(c)(6) non-profit organization of over 250 member physicians" dedicated to fostering "the ability of primary care physicians to provide high quality, patient accessible diagnostic and therapeutic allergy and asthma care." (Rec. Doc. 1 at 4). One of its purposes is to promote the interests of primary care physicians who seek to practice in the allergy testing and immunotherapy markets. (Rec. Doc. 1 at 4). UAS is an LLC that provides "technician and support services for physicians practicing allergy testing and allergen immune therapy." (Rec. Doc. 1 at 5). In this way, "UAS and the primary care and other physicians UAS supports, compete directly with the businesses of board-certified allergists." (Rec. Doc. 1 at 5).

Plaintiffs allege that UAS's services allow primary care physicians to conduct cost-effective allergy skin testing and immunotherapies from these physicians' own offices or clinics. This allows these non-specialized physicians to enter the allergy market for themselves, and eliminates the need to refer patients to board-certified allergists or outsource blood allergy tests to reference laboratories. Plaintiffs allege UAS's entrance into the allergy market had two major consequences: it disrupted the system of referrals from primary care doctors to allergy specialists and it also

required health insurance companies "to pay more upfront in preventative medicine by reaching far more patients than board-certified allergists could in their respective markets." (Rec. Doc. 1 at 10). Defendants are three health insurance companies—who pay the costs of these services for their customers—and a company that was hired as an independent review organization of appeals made to Blue Cross for denying reimbursement claims. The relevant defendants to this Motion are Blue Cross Blue Shield of Louisiana ("Blue Cross") and the independent review company, AllMed Healthcare Management ("AllMed"), who share the law firm of Baker Donelson Bearman Caldwell & Berkowitz, P.C. ("Baker Donelson") as their current counsel. According to Defendants, Blue Cross has been a client of Baker Donelson since 2010, though Baker Donelson only began acting as antitrust counsel in 2018.

UAS began doing business in Louisiana in January of 2010. (Rec. Doc. 57-2 at 2). About three years later, primary care physicians who had contracted with UAS began informing UAS that they had received communications from the Louisiana State Board of Medical Examiners (the "Board") concerning allergy testing and immunotherapy services these physicians had provided in late 2013 and early 2014. (Rec. Doc. 57-2 at 2). These physicians also informed UAS of similar communications received from Blue Cross. UAS sought Donna Fraiche, a partner specializing in health care law at Baker Donelson, to represent UAS and these physicians regarding these communications. Ms. Fraiche agreed to the representation on behalf of Baker Donelson and sent an engagement letter and a term sheet to UAS, which the then-CEO of UAS, Nicolas Hollis, signed on December 5, 2013. (Rec. Doc. 57-2 at 8-10).

The engagement letter states that Baker Donelson has been engaged to represent UAS "with respect to advices regarding [UAS's] relationship with the [Board]." (Rec. Doc. 57-2 at 8).

In January of 2014, UAS met with the Board to discuss the UAS services that were being offered by primary care physicians. The Board was investigating the primary care physicians for "allegedly treating their allergy patients outside their professional scope of practice." (Rec. Doc. 76-2 at 3). According to Movant, a primary reason for this meeting was to discuss an anonymous complaint[1] that had been made to the Board concerning UAS's allergy protocols and services. (Rec. Doc. 57-1 at 4). Before the meeting, Baker Donelson allegedly "review[ed] UAS's confidential information to respond" to the anonymous complainant's questions. (Rec. Do. 57-1 at 4). Ms. Fraiche avers that she passed the information given to her by UAS to the Board, per UAS's instructions. (Rec. Doc. 76-2 at 4).

Ms. Fraiche served as counsel for UAS and several primary care physicians at the meeting. Ms. Fraiche describes her and Baker Donelson's representation at the meeting as an effort to "convince the [Board] not to take these primary care physicians' licenses for treating their allergy patients as general primary care physicians." (Rec. Doc. 76-2 at 3). Ms. Fraiche describes the physicians as the "primary clients" for whom UAS simply paid the bills.

Around the same time, Blue Cross began to deny claims made for reimbursement for allergy testing and immunotherapy that used UAS's protocols. In

---

[1] Movant has allegedly since discovered that the anonymous complainant was actually Blue Cross. (Rec. Doc. 57-1 at 4).

or around February of 2014, UAS asked Ms. Fraiche to also represent UAS and the primary care physicians in appealing these denials by Blue Cross. (Rec. Doc. 76-2 at 5). Baker Donelson began meeting with Blue Cross to discuss Blue Cross's investigation and audits of UAS and its allergy protocols. For Example, on February 18, 2014, Baker Donelson met with Blue Cross's Chief Medical Officer, Dr. Carmouche, on UAS's behalf. (Rec. Doc. 57-1 at 4). Baker Donelson formally accepted this expanded representation in April. In an e-mail dated April 29, 2014, Donna Fraiche wrote to the then CEO of UAS, Nicolas Hollis: "[O]ur firm has now been specifically engaged and authorized to serve as your counsel to the certain physician customers of UAS who received denials from Blue Cross specifically related to the ordering and administration of allergy testing and or immunotherapy as provided through their UAS affiliation and protocols." (Rec. Doc. 57-2 at 12).

Mr. Hollis avers that, "both UAS and the contracting physicians trusted Baker Donelson with confidential information regarding the appeals . . . including the basis for contesting [Blue Cross's] spurious claims of lack of medical necessity." (Rec. Doc. 57-2 at 4). Communications between Mr. Hollis and Baker Donelson were extensive; Mr. Hollis estimates that he exchanged over 500 e-mails with Baker Donelson that he regards as confidential. (Rec. Doc. 57-1 at 4). Using this information, Baker Donelson appealed Blue Cross's denials of reimbursement through an internal review process. The appeals were denied. A second level of appeal was to be handled by an independent review organization. Plaintiffs did not know at the time that the independent review organization was Defendant AllMed. (Rec. Doc. 57-1 at 4).

AllMed denied all of the appeals—which Plaintiffs allege was agreed upon in-advance, as a part of the conspiracy between health insurers in Louisiana. (Rec. Doc. 57-1 at 5).

After these appeals failed, Baker Donelson, as UAS's counsel, reached out to the Louisiana Department of Insurance (the "Department") to set up a meeting with the Department's Commissioner, James Donelon. According to a summary of the meeting published by the Department (the "Summary") (Rec. Doc. 57-2 at 15-21) the meeting was held in July of 2014; Baker Donelson appeared as UAS's legal counsel as did the firm Bracewell & Giuliani L.L.P. Mr. Hollis acted as UAS's company representative. Dr. Carmouche and Dr. Dwight Brower—the Medical Director at Blue Cross—acted as the representatives of Blue Cross. Sheldon Faulk, Senior In-house Counsel of Blue Cross, appeared as Blue Cross's attorney. At the meeting, Dr. Brower informed the commissioner that the independent reviewer had upheld every appeal. However, Movant alleges that "Dr. Brower concealed any agreement with AllMed and denied any agreement with outside allergist organizations." (Rec. Doc. 57-1 at 5).

The Summary—which Baker Donelson helped prepare[2]—demonstrates that the critical issue in this meeting was whether Blue Cross had appropriately denied claims for reimbursement. Blue Cross argued to the Department that its rejection of reimbursement to the primary care physicians using UAS's protocols was justified for

---

[2] Movant's counsel explained at oral argument that while the Summary is a public document submitted by the Department, it is not drafted by the Department because the Department does not take meeting minutes. Rather, the parties draft a version of the Summary for the Department in advance. Defendants do not dispute that Ms. Fraiche took part in preparing the Summary on behalf of UAS. Nor do they dispute that the substance of the document as an accurate account of the meeting.

three reasons: (1) safety, (2) efficacy, and (3) costs. UAS responded to each of these arguments at length. For example, UAS attempted to rebut Blue Cross's arguments that UAS allergy testing and therapy protocols are ineffective by arguing:

> Blue Cross does not cite any adverse events under the UAS protocol and does not refer to any complaints by patients or treating physicians, other than competitor physicians who are upset that they may lose business to their PCP colleagues. UAS sincerely believes the objections are competitor driven and that certain physicians have used unfounded complaints about safety and efficacy to convince Blue Cross Louisiana not to pay those physicians' competitors.

(Rec. Doc. 57-2 at 20). The Department took no action after the meeting.

In late September of 2014, Baker Donelson communicated to the Department that Blue Cross's "actions were threatening UAS's ability to continue to operate in the state of Louisiana." (Rec. Doc. 57-1 at 6). Specifically, in an e-mail Ms. Fraiche sent to the Department on September 29, 2014 (Rec. Doc. 87-3), Ms. Fraiche mentions an impromptu meeting she had with Dr. Carmouche, in which she discussed the antitrust ramifications of Blue Cross's conduct. A few days later, UAS learned from Baker Donelson that Blue Cross had demanded Baker Donelson withdraw from representing UAS and its contracting physicians, because Baker Donelson was representing Blue Cross on an unrelated matter. (Rec. Doc. 57-1 at 5). Baker Donelson then withdrew as UAS's counsel. In 2015, UAS stopped doing business in Louisiana because its contracting physicians in the state could not receive reimbursement from third-party payors, such as Defendants.

UAS initiated this litigation in January of 2018, after allegedly discovering acts of collusion on the part of Defendants. Counsel for UAS first became aware that

Baker Donelson would be representing Blue Cross in this antitrust matter on February 26, 2018. Counsel for UAS called Baker Donelson regarding a possible conflict on March 8, 2018. (Rec. Doc. 57-3 at 1-2). The subsequent back-and-forth communications between UAS's current counsel and Baker Donelson regarding the alleged conflict of interest never resolved the issue to the satisfaction of either party and eventually culminated in the instant Motion to Disqualify Counsel, filed June 1, 2018. Part of the reason for UAS's delay in filing a motion to disqualify appears to be that it did not have access to its client file. UAS first requested its client file on April 6, 2018. UAS did not receive its file from Baker Donelson until July 9, 2018. (Rec. Doc. 87-2 at 7).

Before the Motion to Disqualify was filed, Baker Donelson submitted a motion to dismiss on behalf of Blue Cross (Rec. Docs. 40). In that motion and its accompanying memorandum, Blue Cross defended itself from antitrust allegations by arguing that Blue Cross's decision to deny claim appeals was justified by concerns of safety and the efficacy of treatment. (Rec. Doc. 40-1 at 14). These legitimate concerns, Blue Cross argues in its motion, are the only reasonable explanation of Blue Cross's decisions to deny reimbursement claims. Thus, Plaintiffs' antitrust allegation that the payors illegally conspired to deny claims in order to avoid paying for preventative care is implausible and subject to dismissal.

After UAS filed its amended complaint, Baker Donelson submitted new motions to dismiss on behalf of AllMed (Rec. Doc. 64) and Blue Cross (Rec. Doc. 74). In these motions—still pending before the Court—Baker Donelson maintains that

Blue Cross denied reimbursement claims out of concern for the "safety and efficacy of [the UAS] allergy testing and treatment" protocols. (Rec. Doc. 74-1 at 9).

**APPLICABLE LAW**

A motion to disqualify is a substantive motion that affects the rights of parties; analysis of the motion is therefore subject to the standards that have developed under federal precedents. *In re American Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992). Attorneys practicing before this Court are subject to the Rules of Professional Conduct of the Louisiana State Bar Association, because these are the professional standards have been adopted by our Local Rules. L.R. 83.2.10. Nevertheless, "*how these rules are to be applied are questions of federal law.*" *Id.* at 610 (emphasis added). Furthermore, the Local Rules and the Rules of Professional Conduct are not the "sole authorit[ies] governing a motion to disqualify." *Id.* (citing *In re Dresser Industries, Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)). Courts also consider the ABA's Model Rules of Professional Conduct and the ABA's Model Code of Professional Responsibility.[3] *Parker v. Rowan Companies, Inc.*, No. CIV.A. 03-0545, 2003 WL 22852218, at *2 (E.D. La. Nov. 25, 2003) (J. Vance) (citing *Horaist v. Doctor's Hospital of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001)). Additionally, "[a] Court must take into account not only the various ethical precepts adopted by the profession but also

---

[3] The relevance of the potentially applicable Canon 9 of the ABA Ethical Standards is unclear. The Fifth Circuit has contradicted itself as to whether Canon 9's concern over the "appearance of impropriety" is also a relevant concern to the federal courts. *See Parker v. Rowan Companies, Inc.*, No. CIV.A. 03-0545, 2003 WL 22852218, at *4 (E.D. La. Nov. 25, 2003) (collecting diverging Fifth Circuit cases).

the societal interests at stake." *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995). The relevant provisions of the Rules of Professional Conduct provide:

> **Rule 1.9. Duties to Former Clients**
> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

> **Rule 1.10. Imputation of Conflicts of Interest: General Rule**
> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

LA. RULES OF PROF'L CONDUCT R. 1.9(a), (c), 1.10(a). Rules 1.9 and 1.10 of Louisiana's Rules of Professional Conduct are substantially similar to their counterparts in the Model Rules. *See* MODEL RULES OF PROF'L CONDUCT R. 1.9, 1.10.

In the Fifth Circuit, the substantial relationship test governs whether Rules 1.9 and 1.10 require disqualification of an attorney—and his firm by virtue of imputation. The test places the burden on the movant to satisfy two prongs:

> (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify; and

> (2) a substantial relationship between the subject matter of the former and present representations.

*American Airlines*, 972 F.2d at 614. Once a Movant proves that adverse counsel previously represented him as his attorney, the court's inquiry is narrowed to the sole issue of whether this prior representation is substantially related to the instant representation. *Id.* That is because a finding of a substantial relationship will trigger

two irrebuttable presumptions. *Id.* First, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." *Id.* (citing *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981)). The "second irrebuttable presumption is that confidences obtained by an individual lawyer will be shared with the other members of his firm." *Id.* at 614 n.1 (citing *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1346 (5th Cir. 1981)).

Therefore, evidence that a firm has carefully screened a conflicted attorney and that no confidential information has been shared between attorneys in the conflicted attorney's firm is irrelevant.[4] In the words of the Fifth Circuit: "the test is categorical in requiring disqualification once a substantial relationship between past and current representations is established." *Id.*

In part because courts have no discretion as to the remedy, the test is never to be applied cavalierly or mechanically. *See id.* Disqualification is a harsh consequence for both the disqualified attorney as well as the client. *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1313 (5th Cir. 1995) ("Depriving a party of the right to be represented by the attorney of his or her choice is a penalty that must not be imposed without careful consideration."). Nor is the test to be applied in a way that would forever foreclose a lawyer from ever representing any interest that is adverse to a former

---

[4] The notable exception to conflict imputation to a firm is the case of the migrating attorney. LA. RULES OF PROF'L CONDUCT R. 1.9(b) ("When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless: (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and (2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter.").

client. *Parker*, 2003 WL 22852218, at *3. Moreover, courts must be alert to the possibility that a motion to disqualify may be used as a mere "'procedural weapon' to advance purely tactical purposes." *American Airlines*, 972 F.2d at 611. Accordingly, it is required that a court engage in a "painstaking analysis of the facts and precise application of precedent." *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 174 (5th Cir. 1979).

The purpose of the substantial relationship test is twofold: preservation of the "duty of confidentiality" and preservation of the "duty of loyalty," both owed to the former client. *American Airlines*, 972 F.2d at 618. In *In re American Airlines, Inc.*, the Fifth Circuit reviewing its precedent noted that the test is not only concerned with "actual fairness" in proceedings, but also "safeguard[ing] the integrity of the attorney-client relationship." *Id.* at 619. Our Court of Appeals noted that its precedents demand disqualification in some circumstances where no confidential information has been exchanged between client and counsel. *Id.* Rather, "the provision of legal advice on a substantially related matter by itself requires disqualification." *Id.* (citing *Corrugated*, 659 F.2d at 1346–47, *Brennan's*, 590 F.2d at 171–72).

## DISCUSSION

### I.   THERE WAS AN ACTUAL ATTORNEY-CLIENT RELATIONSHIP BETWEEN UAS AND BAKER DONELSON

Baker Donelson admits to providing "government relations services" for UAS, but denies in its opposition that these were *legal* services. (Rec. Doc. 76-8 at 8). Thus,

Baker Donelson appears to have argued that the first prong of the substantial relationship test is unmet.[5]

Whether an attorney-client relationship exists is determined under state law. *Hopper v. Frank*, 16 F.3d 92, 95 (5th Cir. 1994). The Louisiana Supreme Court has cited to the applicable Restatement for guidance, which states that an attorney-client relationship is formed when:

> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
>> (a) the lawyer manifests to the person consent to do so; or
>> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services.

*In re Austin*, 943 So. 2d 341, 347 (La. 2006) (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14 (2000)). The event, or series of events, which triggers the formation of an attorney-client relationship can often be subtle, because "[t]he existence of an attorney-client relationship turns largely on the client's subjective belief that such a relationship exists." *Sumpter*, 2013 WL 2181296, at *7 (citing *La. State Bar Ass'n v. Bosworth*, 481 So.2d 567, 571 (La.1986)).

Here however, it is inescapably clear that an attorney-client relationship formed because Baker Donelson formally manifested its consent in an engagement

---

[5] There is language in Defendants' opposition suggesting that other standards besides the substantial relationship test should be considered. In their opposition, Defendants cite frequently to an order and reasons from this Court, *United States v. DeCay*, 406 F. Supp. 2d 679, 685 (E.D. La. 2005) (J. Barbier). *DeCay* involved a criminal proceeding and so this Court applied the Fifth Circuit test that is the appropriate in the "specific context of criminal cases." *Id.* at 684. The Court's observation that the presumption of shared confidences could be rebutted where a criminal defense attorney represented a former client only in preliminary proceedings is quite obviously without relevance to this case. The substantial relationship test is the only applicable standard here, and its presumptions are irrebuttable.

letter it sent to UAS. The letter, written on firm letterhead by attorney Donna Fraiche and addressed to UAS, states as its subject line: "*Engagement as counsel.*" (Rec. Doc. 57-2 at 8). In the third paragraph of the engagement letter, Ms. Fraiche breaks down her billing rates for "legal services." Attached to the engagement letter was a document listing the terms of engagement. The term sheet begins: "We appreciate your decision to retain Baker Donelson . . . as your legal counsel." (Rec. Doc. 57-2 at 10). Any reasonable person, and one would hope any reasonable attorney, would agree that this letter marks the formation of an attorney-client relationship.[6] Furthermore, UAS states—and Baker Donelson has not refuted—that UAS's client file indicates that "UAS was billed more than $200,000 for 'legal services rendered.'" Finally, the summary of the meeting that took place between UAS, Blue Cross, and the commissioner of the Louisiana Department of Insurance labels Donna Fraiche and Baker Donelson as UAS's "legal counsel." Frankly, given this evidence it is troubling that Baker Donelson would even argue in its briefs that it was never engaged as UAS's attorney.[7] The first prong is met.

---

[6] Baker Donelson cites to a considerable amount of case law, but little of it concerns when an attorney-client relationship forms. Rather, the cases Baker Donelson cites involve analyses of the attorney-client privilege. This is obviously a separate inquiry and one that must follow a finding that an attorney-client relationship exists.

[7] At the hearing, upon being asked a second time whether Baker Donelson had provided legal services, counsel for Blue Cross conceded: "We are not denying and we admit in our pleadings that there is an attorney-client relationship." The Court disagrees with this characterization of the pleadings and therefore feels it must address the arguments put forth in Baker Donelson's memorandum arguing it did not provide legal services.

## II. THE PREVIOUS AND CURRENT REPRESENTATIONS ARE SUBSTANTIALLY RELATED

As Defendants point out, Baker Donelson should not be disqualified merely because the firm previously represented UAS in another matter. Rather, UAS "bears the burden of proving that the present and former representations are substantially related." *Parker*, 2003 WL 22852218, at *5 (citing *Duncan*, 646 F.2d at 1028).

### 1. What Is Required for Two Representations to be Substantially Related

What exactly is required for two representations to be "substantially related" to one another has not been conveniently captured in a concise turn of phrase by the Fifth Circuit. The Louisiana Supreme Court, attempting to distill a singular idea from various courts' opinions, has stated that "two matters are 'substantially related' when they are so interrelated both in fact and substance that a reasonable person would not be able to disassociate the two." *Walker v. State, Dept. of Transp. and Dev.*, 817 So. 2d 57, 62 (La. 2002). Judge Vance, compiling the case law of the Fifth Circuit and the Eastern District of Louisiana, found the test to be less demanding than that: "the substantial relationship test requires common subject matters, issues and causes of action, but it does not require the same factual scenarios in both cases." *Parker v. Rowan Companies, Inc.*, No. CIV.A. 03-0545, 2003 WL 22852218, at *10 (E.D. La. Nov. 25, 2003).[8] However, this encapsulation also appears to unduly limit which

---

[8] The Fifth Circuit states in *American Airlines*, that "American has succeeded in 'delineating with specificity the subject matters, issues and causes of action' common to prior and present representations in the manner demanded by our precedents. 972 F.2d at 628 (quoting *Duncan*, 646 F.2d at 1029). The Court takes this merely to mean that the burden is on the movant to sufficiently

matters can be considered substantially related. In *American Airlines* the Fifth Circuit declared that the "two representations need only involve the same 'subject matter' in order to be substantially related." *Id.* at 625.[9]

Because *American Airlines* remains the ultimate authority on when two matters are substantially related in the Fifth Circuit, the Court will depend on that opinion as its pole star. In *American Airlines*, the Fifth Circuit issued a writ of mandamus in response to a petition by the defendant to an antitrust dispute, American Airlines. The writ directed the district court to disqualify Vincent & Elkins, which was representing the plaintiff, Northwest Airlines. *Id.* at 628. The Court found a substantial relationship existed between the antitrust suit in which V&E represented Northwest Airlines, and three matters in which V&E had previously represented American Airlines.

One of the matters V&E had advised American Airlines on was "Project Armadillo," a proposal by American to acquire Continental Airlines. *Id.* at 625. V&E provided antitrust analysis to help American decide how to approach the acquisition.

---

detail the representations so that the Court can accurately determine whether matters are substantially related. In the quoted case, the Fifth Circuit rebuffed the district court for accepting statements so broad they "could be applied to virtually any law firm that had ever represented Merrill Lynch or any large brokerage firm." *Duncan*, 646 F.2d at 1029. There is not a requirement that representations actually share common causes of action, as the Fifth Circuit so held in *American Airlines*, 972 F.2d at 622-23.

[9] Comment [9] to ABA Model Rule 1.9 states: "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." This disjunctive definition recognizes two scenarios where disqualification is appropriate. The first scenario involves an attorney or firm switching to a new side mid-transaction or mid-litigation. The second situation may involve two separate, but related matters which are so similar that confidential information obtained during the representation of one may likely be used in the subsequent representation. *See, e.g.*, *Parker*, 2003 WL 22852218, at *9.

Specifically, the firm advised American on how it could avoid a challenge under the Department of Justice's antitrust guidelines. The representation lasted about three months, before American chose not to pursue the acquisition. V&E's primary argument against disqualification was that the problem posed to V&E "required little detailed analysis and that all the information needed by [V&E] to reach its conclusion 'was and is publicly available.' Because [V&E] required no confidential information . . . Northwest contend[ed] that [V&E's] representation provide[d] no basis for disqualification." *Id.* at 626. The Fifth Circuit found that this "argument would fail even if [Northwest] could show that all of the information was public knowledge." *Id.* The Court emphasized that that there was no public information exception. The only relevant question was whether the two representations are substantially related. *Id.* The matters were substantially related, because V&E gave advice to American on the issue of market definition, also an issue of importance in the antitrust suit, and because V&E was privy to its former clients' views on air transportation markets, another issue in the ongoing antitrust suit. *Id.* at 625-28.

Another prior representation by V&E was for a suit brought by a Continental Airlines affiliate, System One, against American for alleged breach of antitrust laws. *Id.* at 623-25. System One—a computer reservation system vendor—charged that American had engaged in acts intended to unfairly exclude System One from the market. Northwest argued that this representation did not require disqualification, because V&E could not raise any issues relating to computer-reservation systems. That dispute was already resolved by settlement or trial. V&E was therefore barred

from raising the issue of computer-reservation systems by settlement and res judicata. Nevertheless, the Fifth Circuit was not persuaded that the representations could not be substantially related, simply because the matters of the previous representation could not or would not be introduced in the case *sub judice*. The Court was concerned that "in the particular case of res judicata, it places the former counsel in the position of attempting to minimize the beneficial results of her prior representations by limiting their effect in the present case." *Id.* at 624. V&E also argued that the representations were not substantially related because a critical issue that was present in the System One antitrust litigation, override commissions, was not at issue in the case before the Fifth Circuit. The Court of Appeals again was unsatisfied, because the test only requires common "subject matter." Each of the representations involved "American's travel agency commission 'practices and procedures.'" *Id.* at 625. That was enough to find a substantial relationship. *Id.* (citing *Duncan*, 646 F.2d at 1032).

The third representation—the "Fort Bend" case—that required disqualification of V&E, was V&E's defense of American from charges of breach of contract, and similar conduct, brought by Continental. The Fort Bend litigation was not an antitrust suit, but Continental's complaint charged that "American, having achieved dominance in the CRS market, in turn used SABRE to 'exclude Continental in whole or in part from specific airline passenger markets.'" *Id.* at 622. Despite that these litigations involved different causes of action, the Fifth Circuit found them to be substantially related. Documents from that prior representation showed that V&E

feared that evidence of price-fixing on the part of American's president would be used against American in the Fort Bend litigation, and V&E worked to exclude it. In the case then before the Fifth Circuit, Northwest, through its counsel, V&E, referred to this price-fixing solicitation to support its allegation in its complaint, alleging that "AA and its current chief executive officer have previously engaged in anti-competitive conduct and open contempt for the antitrust laws." *Id.* at 623. That the price-fixing solicitation could not be used as evidence was not dispositive. "[T]he subject matter 'does not need to be *relevant* in the evidentiary sense to be *substantially related*.' It need only be akin to the present action in a way reasonable persons would understand as important to the issues involved." *Id.* (emphasis added) (quoting *Corrugated*, 659 F.2d at 1346).

It is clear that any one of these substantially related representations alone required disqualification. The Fifth Circuit analyzed all three representations with "painstaking" examination in order to provide guidance to the district courts. Taken together, the Court finds that these examples demonstrate that the representations now before the Court are substantially related.

### 2. Baker Donelson's Representations are Substantially Related

Plaintiffs allege in this case that the Defendants engaged in "a conspiracy and agreement among various health insurance company competitors . . . to restrict competition in the relevant markets for allergy testing and allergen immunotherapy for seasonal and perennial allergies . . . in local areas throughout Louisiana." (Rec. Doc. 1 at 1-2). Plaintiffs allege that UAS provides skin allergy testing and

immunotherapies protocols that can be used safely and efficiently by primary care physicians. This more accessible preventative care allegedly increased costs for third-party payors. This caused Defendants to respond by conspiring to refuse reimbursement for these services on the false grounds that the tests were unsafe and inefficient. Defendants vehemently reject the allegation that they did not have cause to deny reimbursement. They deny any conspiracy and argue that the reason that payors all began rejecting claims around the same time was because, "[Blue Cross], and apparently other payors, realize[d] that any short term financial benefit from having large numbers of underschooled or ill-informed physicians perform allergy tests and provide immunological therapies to allergy sufferers would very likely result in much higher health care costs when ineffective or failed treatment results in more dramatic and more critical patient outcomes." (Rec. Doc. 40-1 at 1)

Thus, it appears that the safety and medical efficacy of the services provided by primary care physicians pursuant to UAS's protocols is a critical issue in this antitrust case. It is true that there are other, possibly dispositive issues as well; for example, Defendants contest Plaintiffs' standing to bring an antitrust suit against Defendants. However, the Fifth Circuit concluded when finding the System One representation substantially related, that there need not be an exact overlap of the issues of each representation. *Id.* at 623-25. In fact, the Fifth Circuit specifically rejected the proposition urged by V&E then—and now by Baker Donelson—that the presence of distinguishing issues rendered two representations not substantially related. *Id.* at 625. The proper method to compare the representations is to look at

how they are alike, not how they are different. This Court has no difficulty concluding that representations are substantially related where counsel advises its current client on the subject matter it had previously advised its former client, in an effort to help the current client to prevail over the former on a critical issue shared between the two representations. *See American Airlines*, 972 F.2d at 628.

It is not necessary for this Court to conjure up a hypothetical scenario where "there is a substantial risk that confidential information as would normally or typically have been obtained in [Baker Donelson's] prior representation of [UAS] would materially advance [Blue Cross's] position in the present case," because it is apparent from the filings already submitted that Baker Donelson is in a position to use information confided from UAS while UAS was its client.[10] *See Bowers v. Ophthalmology Group*, 733 F.3d 647, 654 (6th Cir. 2013). Baker Donelson, begins its motion to dismiss alleging:

> UAS and . . . the AAAPC, have been on a crusade to create and enhance the demand for UAS' allergy testing equipment by championing allergy

_____

[10] Defendants go so far as to ask rhetorically in their opposition, "Is UAS concerned that it shared information with Ms. Fraiche that shows that UAS knows that its protocols and treatments are not in fact medically appropriate, efficacious, and safe?" Movant argues that "[c]lients should not have to answer taunts such as those lodged by its former counsel" by demonstrating what confidences were shared with former counsel. (Rec. Doc. 87-2 at 5). Movant is correct that the substantial relationship test was developed to avoid such an inquiry. However, there is another problem. Perhaps UAS really is concerned with serious deficiencies in UAS's protocols, which UAS shared with Baker Donelson in confidence. If that is the case, UAS will likely have a difficult time winning its case against Defendants. Nevertheless, UAS has a right to expect this damaging information it shared with its own attorney will be kept in confidence. Moreover, if Baker Donelson is privy to confidential information which casts doubt on the efficacy and safety of UAS's allergy protocols, Baker Donelson's duty of loyalty to UAS prevents it from using that information to the benefit of Blue Cross. LA. RULES OF PROF'L CONDUCT R. 1.9(c). As the Court found above, the efficacy and safety of the protocols will be a critical issue in this case. Therefore Baker Donelson would be materially limited in its ability to represent Blue Cross, due to this pre-existing duty to UAS not to disclose this crucial information. LA. RULES OF PROF'L CONDUCT R. 1.7(a)(2). Disqualification may also be appropriate because of a conflict of interest between Baker Donelson and its current client, Blue Cross. All of this goes to show the wisdom of a prophylactic rule.

testing as a new source of revenue for primary care physicians. Consistent with this market push, UAS set out to force third party payors such as [Blue Cross] to abandon their commitment to promote only proven medical methodologies and to reduce the enormous cost of health care by carefully and continually reviewing and analyzing medical treatments and procedures. By allowing reimbursement only for proven methodologies, [Blue Cross] actively discourages inefficient, unnecessary, untested and potentially dangerous medical treatments and procedures.

(Rec. Doc. 40-1 at 7). The obvious problem is that it was Baker Donelson itself who had been urging Blue Cross that UAS had a "proven medical methodology" and that the UAS's services helped "reduce the enormous cost of health care" by providing an alternative to costly allergy specialists. Certainly, when Baker Donelson argued to the Louisiana Board of State Medical Examiners on behalf of UAS and UAS's contracting physicians that those physicians should not lose their medical licenses, Baker Donelson was not arguing that these physicians were "underschooled or ill-informed" or that their treatments were resulting in "more dramatic and more critical patient outcomes." Similar to the Fort Bend matter in *American Airlines*, this is a case where Baker Donelson has placed itself in the position of attacking its own prior advocacy made on behalf of its former client. *See* 972 F.2d at 623 (finding representations substantially related where the plaintiff, through counsel V&E, cited prominently to an alleged price-fixing solicitation, which was "the same allegation that [V&E] lawyers were charged with excluding in the Fort Bend case").

These representations share a common subject matter because the issue of whether the reimbursement appeals were decided on merit or in conspiracy among third-party payors is common to both. *See id.* at 628. Movant is not asking for

disqualification because "[defendants'] counsel provided general advice to the [movant] in the past." *Sumpter*, 2013 WL 2181296, at *9 (citing *Parker*, 2003 WL 22852218, at *5). Rather, Movant has shown that the Defendants will be attacking the legitimacy of UAS's services as a defense to the alleged antitrust conspiracy. The viability of these services was the very thing that UAS hired Baker Donelson to defend in front of the Board, Blue Cross, and the Department of Insurance. Thus, UAS has successfully delineated with specificity the subject matters and issues common to the prior and present representations in the manner demanded by the Fifth Circuit. *See Duncan*, 646 F.2d at 1029.

Defendant argues that the matter before the Court is an antitrust litigation, pure and simple, and the previous representation was a matter of healthcare law advanced by an attorney prominent in that field. Thus, the matters are unrelated. Even if this Court were to reduce the inquiry into the subject matter of the two representations to that level of superficiality, disqualification would still be appropriate. In her representation of UAS, Ms. Fraiche explicitly contemplated antitrust issues being implicated by Blue Cross's denial of the appeals for reimbursement. In an e-mail to the Department of Insurance, Ms. Fraiche, wrote that she had met with Dr. Carmouche of Blue Cross and warned him of the "anti trust ramifications" of a boycott intended to benefit allergy specialists. (Rec. Doc. 87-3). Therefore, there is evidence in the record that Baker Donelson represented UAS's position on antitrust issues to Blue Cross's corporate representative and to the Department.

Because these representations share a common subject matter and a critical issue, the Court finds that the matters are substantially related. And because that triggers two irrebuttable presumptions,[11] one remedy is allowed: disqualification of Baker Donelson. *See Sumpter*, 2013 WL 2181296, at *10. Defendants suggest that disqualification of the entire firm through imputation is not required because attorney Donna Fraiche is not involved in the case at bar, and certain screening measures have been put in place to prevent sharing of confidences. None of this is relevant because the substantial relationship test obviates the need for a court to attempt to divine what was shared, when, and by whom in a firm which has switched sides. *See Corrugated*, 659 F.2d at 1347; *Sumpter*, 2013 WL 2181296, at *9 ("Considering the irrebuttable presumption that [defendants' counsel] shared [movant's] confidences during her prior representation with her fellow . . . attorneys, and the plain language of Louisiana Rule 1.10, which automatically disqualifies all lawyers in a law firm when one attorney in the firm is disqualified, the Court has no choice but to disqualify the entire . . . firm as [defendants'] counsel in this case.").[12]

---

[11] Defendants' argument against presuming shared confidences between UAS and Ms. Fraiche is without merit. Defendants allege Ms. Fraiche was never given confidential information because she passed all she was told regarding UAS's allergy protocols to the Board in accordance with UAS's instructions. (Rec. Doc. 76 at 5). Defendants confuse the attorney-client privilege with the duty to keep confidences. An attorney must keep his client's confidences regardless of whether privilege has been waived. *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 172 (5th Cir. 1979) ("Information [acquired in confidence] is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. This is true without regard to whether someone else may be privy to it.").

[12] The Fifth Circuit acknowledged in *In re Corrugated Container Antitrust Litigation*, that the second irrebuttable presumption of shared confidences among attorneys in a firm might be unduly harsh in the case of imputation made because of a migrating attorney. 659 F.2d at 1347. This hesitation presaged the Fifth Circuit's holding in *In re ProEducation Intern., Inc.*, 587 F.3d 296, 303 (5th Cir. 2009) that a bankruptcy court erred in refusing to consider evidence that an attorney formerly belonging to a firm that was representing a party, had never had any interaction with this party himself while it was a client of his former firm. There are no migrating attorneys in this case, and

Both prongs of the substantial relationship test are met. Disqualification is required.[13]

### 3. The Motions to Dismiss Submitted by Baker Donelson

There are two motions to dismiss the amended complaint currently pending before the Court that were prepared by Baker Donelson on behalf of Blue Cross (Rec. Doc. 74) and AllMed (Rec. Doc. 64). Movant argues that the pending Motions to Dismiss are "infected" by the conflict of interest and cast a "cloud of doubt" that undermines fairness in these proceedings. (Rec. Doc. 87-2 at 9). Accordingly, this Court has deferred consideration of these motions until it could decide the issue of disqualification. *See Bowers*, 733 F.3d at 655 (finding district court erred in granting summary judgment before considering plaintiffs' motion to disqualify). Now that this Court has determined that a disqualifying conflict of interest exists in this case, it would be improper for this Court to consider these motions prepared by Baker Donelson. Defendants must obtain counsel not subject to a conflict of interest to ensure that the further proceedings—including any refiled motions to dismiss—"are not subject to the possible taint of confidential information." *Id.*

---

regardless, the "exception is inapplicable here; the firm itself changed sides." *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1267 (7th Cir. 1983).

[13] Defendants also take issue with Movant's alleged delay in submitting the Motion to Disqualify. (Rec. Doc. 76 at 5) ("[T]here is no better proof that UAS did not share confidences with Baker Donelson than the fact that UAS waited to file their Motion to Disqualify until after current Baker Donelson antitrust counsel" discussed the case with their clients.). Movant counters that any delay was due to Baker Donelson's repeated failure to hand over the client file and provide an undisputed timeline detailing Movant's attempts to have Baker Donelson withdraw prior to the filing of the Motion. "Ideally, conflict of interest problems should be settled between the attorney and his client." *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1315 (5th Cir. 1995). The Court finds the record adequately explains Movant's delay in this case.

**CONCLUSION**

Accordingly,

**IT IS ORDERED** that the *Motion to Disqualify Counsel of Record* **(Rec. Doc. 57)** is **GRANTED**.

**IT IS FURTHER ORDERED** that the *Motion to Dismiss for Failure to State a Claim* **(Rec. Doc. 64)** submitted on behalf of AllMed and the *Motion to Dismiss Plaintiffs' First Amended Complaint* **(Rec. Doc. 74)** submitted on behalf of Blue Cross are **DENIED without prejudice.**

New Orleans, Louisiana, this 2nd day of October, 2018.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE