UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ACADEMY OF ALLERGY &                    CIVIL ACTION
ASTHMA IN PRIMARY CARE,
ET AL.

VERSUS                                  18-399

LOUISIANA HEALTH                        SECTION: "J" (2)
SERVICE AND INDEMNITY
COMPANY, ET AL.

## ORDER & REASONS

Before the Court are *Motions to Dismiss* filed by Defendants Humana Inc. ("Humana") **(Rec. Doc. 67)**, Blue Cross and Blue Shield of Kansas, Inc. ("BC Kansas") **(Rec. Doc. 69)** and Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BC Louisiana") and AllMed Healthcare Management, Inc. ("AllMed") **(Rec. Doc. 131)**. The parties have extensively briefed these motions. (*See* Rec. Docs. 102, 103, 112, 113, 149, 150, 152, 153, 158, 159, 164, 167, 177, 178). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that the motions should be **GRANTED in part** and **DENIED in part**.

## FACTS AND PROCEDURAL BACKGROUND

This litigation arises from an alleged conspiracy to exclude Plaintiffs from the market for allergy testing and allergen immunotherapy in certain areas of Louisiana, Kansas, and other states. Plaintiff United Biologics, LLC, d/b/a United Allergy Services ("UAS") provides technician and support services for primary care

physicians who practice allergy testing and immunotherapy. Plaintiff Academy of Allergy & Asthma in Primary Care ("AAAPC") is a non-profit organization composed of primary care physicians who seek to provide allergy and asthma treatments to patients.

Plaintiffs allege that UAS's services allow primary care physicians to conduct cost-effective allergy skin testing and immunotherapies from these physicians' own offices or clinics. This allows these non-specialized physicians to enter the allergy market for themselves and eliminates the need to refer patients to board-certified allergists or outsource blood allergy tests to reference laboratories. Plaintiffs allege UAS's entrance into the allergy market had two major consequences: it disrupted the system of referrals from primary care doctors to allergy specialists and it also required health insurance companies "to pay more upfront in preventative medicine by reaching far more patients than board-certified allergists could in their respective markets."[1] Defendants are three health insurance companies (Humana, BC Kansas, and BC Louisiana; collectively, the "Insurer Defendants") who pay the costs of these services for their subscribers, and a company (AllMed) that was hired as an independent review organization of appeals made to BC Louisiana for denying reimbursement claims.

The overarching theme of Plaintiffs' complaint is that there is a "conspiracy and agreement among various health insurance company competitors . . . to restrict competition in the relevant markets for allergy testing and allergen immunotherapy

---

[1] (Second Amended Complaint, Rec. Doc. 145, at 11) (hereinafter "SAC").

for seasonal and perennial allergies . . . in local areas throughout Louisiana, Kansas, and other local markets serviced by Humana."[2] Plaintiffs allege that when UAS entered the market in 2009, health insurance companies, including the Insurer Defendants, reimbursed claims for services by primary care providers working in conjunction with UAS technicians. UAS's entrance to the market greatly expanded the availability of allergy treatment; for instance, in Louisiana there are less than 40 board-certified allergists, the majority of whom are in major metropolitan areas, but almost 70 primary care physicians, many in rural areas, contracted with UAS to provide allergy testing and immunotherapy.

Plaintiffs allege than when the Insurer Defendants noticed an influx of primary care physicians treating more patients with allergy testing and immunotherapy, they began devising ways they could deny payment and thus limit claims. Humana acquired a strategy of denying payment on the theory of "pass through billing" from a trade association of board-certified allergists and shared this information with Blue Cross and Blue Shield of Texas, who passed it on to BC Louisiana. BC Louisiana determined that this strategy was not viable and sought other ways to deny claims. The Insurer Defendants used services provided by the National Health Care Anti-Fraud Association, including an online database and conference calls, to discuss potential strategies and share reimbursement information. They also began directly contacting primary care physicians, threatening claim denials and audits to discourage them from working with UAS.

---

[2] *Id.* at 1-2.

BC Louisiana developed a strategy to deny claims as not "medically necessary" based on materials provided by a trade association of board-certified allergists and sought an independent review organization that agreed with its assessment and would uphold the denials should they be appealed. AllMed agreed to do so, and BC Louisiana determined it would send all such appeals to AllMed rather than randomly assigning an independent review organization.

In January 2014, BC Louisiana, BC Kansas, and Humana began denying claims for UAS's services. Unaware of Defendants' conspiracy, UAS and its partner physicians continued providing services and submitting claims for reimbursement and appealed the denial of those claims. AllMed denied every appeal as not medically necessary. The Insurer Defendants contacted subscribers directly to inform them that their claims would not be reimbursed, sent overpayment notices to providers, and threatened to kick providers out of their networks if they did not terminate their contracts with UAS. The Insurer Defendants continued to engage in discussions with each other and other insurance companies, including at meetings in San Antonio, Dallas, New Orleans, and Anaheim, California, on denying reimbursement for UAS's services. Eventually, UAS was forced to withdraw from numerous markets, including those in Louisiana and Kansas.

Plaintiffs now bring claims under Sections 1 and 2 of the Sherman Act as well as claims for tortious interference with contracts, tortious interference with business relations, and fraud, and also seek declaratory and injunctive relief. Defendants moved to dismiss the complaint for failure to state a claim. BC Kansas also contends

that the Court lacks personal jurisdiction over it. The motions are before the Court on the briefs and without oral argument.

## **LEGAL STANDARD**

Rule 12(b)(2) of the Federal Rules of Civil Procedure permits dismissal of a suit for lack of personal jurisdiction. "Where a defendant challenges personal jurisdiction, the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists." *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). However, the plaintiff is not required to establish jurisdiction by a preponderance of the evidence; a prima facie showing is sufficient. *Id.* The court must accept the plaintiff's uncontroverted allegations and resolve all conflicts between the facts contained in the parties' affidavits and other documentation in favor of jurisdiction. *Id.*

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and must draw all reasonable

inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).  However, "'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (citation omitted).

## DISCUSSION

### I.   PERSONAL JURISDICTION

The Court must first determine whether Plaintiffs have established personal jurisdiction over BC Kansas[3] before considering Defendants' other arguments. BC Kansas contends the Court lacks personal jurisdiction over it under the Clayton Act because it does not transact substantial business within the Eastern District of Louisiana and also lacks jurisdiction under the traditional minimum contacts analysis because it has not purposefully availed itself of the privilege of doing business in Louisiana.

Plaintiffs assert that personal jurisdiction over BC Kansas exists under Section 12 of the Clayton Act, which provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. "This provision allows for jurisdiction over any federal antitrust suit in any district in which a defendant transacts business." *Access Telecom, Inc. v. MCI*

---

[3] While Humana also raised a challenge to this Court's exercise of personal jurisdiction in its original motion to dismiss (Rec. Doc. 67-1, at 28-30), Humana has since withdrawn its jurisdictional argument. (Rec. Docs. 99-2, 99-3).

*Telecomms. Corp.*, 197 F.3d 694, 718 (5th Cir. 1999). A corporation must transact business of a "substantial character" for jurisdiction to be established under the Clayton Act. *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 373 (1927). Whether a corporation transacts business of a substantial character "is to be judged from the point of view of the average businessman and not in proportion to the sales or revenues of the defendant." *Black v. Acme Markets, Inc.*, 564 F.2d 681, 687 (5th Cir. 1977). Transacting business includes purchasing as well as sales, and the activity that constitutes transacting business need not be connected to the subject matter of the underlying suit. *Id.*

Plaintiffs have provided evidence that BC Kansas transacts business within the Eastern District of Louisiana. Specifically, Plaintiffs have submitted evidence that, between 2014 and 2018, BC Kansas maintained over 400 subscribers per year, collected an average of $243,245.13 per year in premiums, and paid on average $280,187.83 per year to healthcare providers for services provided to its subscribers in this district.[4] Under Fifth Circuit precedent, this constitutes business of a substantial character. *See Pape Television Co. v. Associated Artists Prod. Corp.*, 277 F.2d 750, 751-52 (5th Cir. 1960) (holding $32,000 in sales, which is approximately $279,000 in 2020 dollars considering inflation, payable over 35 months constituted substantial business); *Green v. U.S. Chewing Gum Mfg. Co.*, 224 F.2d 369, 371 (5th Cir. 1955) (holding that having two regular customers and conducting $25,000 annually in sales, which is approximately $240,000 in 2020 dollars considering

---

[4] (Rec. Doc. 177-2, at 5).

inflation, constituted substantial business); *see also Black*, 564 F.2d at 387 n.10 (noting that $375,000 in purchases was sufficient to establish venue); *In re Blue Cross Blue Shield Antitrust Litig.*, 225 F. Supp. 3d 1269, 1298 (N.D. Ala. 2016) (holding that having four subscribers, collecting $12,508 in premiums, and paying $86,700 to healthcare providers per year constituted substantial business).

While BC Kansas argues that these contacts are "tenuous and incidental" because they result from the insured's decision rather than its own, the cases it relies on are distinguishable in that they lacked the evidence of substantial purchase and sales activity that is present here. For instance, in *Daniel v. American Board of Emergency Medicine*, 428 F.3d 408, 430 (2d Cir. 2005), the only evidence of the defendant's revenue in the district was an affidavit from its executive director, which stated that such revenue was "de minimis." Moreover, the Supreme Court has rejected the notion that "hairsplitting legal technicalities" can defeat venue under the Clayton Act; instead, "[t]he practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' became the test of venue." *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807-08 (1948). Because collecting payments from customers, providing services to them, and paying others for services provided to its customers meet this definition of "transacting business," *see Black*, 564 F.2d at 687, the Court concludes that it has personal jurisdiction over BC Kansas.[5]

---

[5] Because the Court concludes that personal jurisdiction exists under the Clayton Act, it need not consider whether it exists under Louisiana's long-arm statute. *See Omni Capital Int'l, Ltd. V. Rudolf Wolff & Co.*, 484 U.S. 97, 105 (1987); *see also In re Blue Cross*, 225 F. Supp. 3d at 1301 (considering

## II.   STANDING

Defendants argue that UAS lacks standing for the Sherman Act claims because UAS has not suffered antitrust injury and is not a proper plaintiff. BC Louisiana and AllMed also contend that AAAPC lacks associational standing for its claims.

### A.   Antitrust Standing

Standing to bring an antitrust claim requires a plaintiff to show: (1) "injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct"; (2) antitrust injury; and (3) "proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The proper plaintiff inquiry considers "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988).

Defendants first contend that Plaintiffs have not alleged antitrust injury because they have only alleged injuries to themselves, not an injury to competition.

---

jurisdiction under state long-arm statute only in the alternative, after determining that jurisdiction existed under the Clayton Act).

However, the Fifth Circuit has clearly explained "that the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing." *Doctor's Hosp. of Jefferson*, 123 F.3d at 305. Defendants' reliance on *Marucci Sports, LLC v. National Collegiate Athletic Association*, 751 F.3d 368, 376 (5th Cir. 2014), for this argument is misplaced, because that case was concerned with whether plaintiffs had sufficiently alleged a restraint on trade to state a claim under the Sherman Act, not standing.

Defendants also contend that UAS cannot establish antitrust injury because it is merely a supplier to primary care physicians and therefore does not directly compete with board-certified allergists. Defendants point out that UAS is prohibited from practicing medicine in Louisiana without the direct supervision of a licensed physician, does not have a reimbursement arrangement with BC Louisiana or any other insurance company, and cannot charge patients for its services. Thus, Defendants contend, UAS lacks antitrust injury because it is neither a consumer nor competitor in the market for allergy testing and immunotherapy.

Plaintiffs contend that UAS suffered antitrust injury because UAS provided services to patients "in conjunction" with primary care physicians until it was excluded from the relevant market by Defendants' conduct. Plaintiffs further contend that UAS is a proper plaintiff "because it is the most directly affected victim of Defendants' antitrust violations." However, Plaintiffs do not dispute the factual allegations raised by Defendants.

UAS's exclusion from the market is certainly "injury of the type the antitrust laws were intended to prevent" because it "reflect[s] the anticompetitive effect" and "flows from" Defendants' unlawful agreement to deny claims from providers working with UAS. *Brunswick*, 429 U.S. at 489; *see Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*, No. 10-00124, 2010 WL 3488244, at *13 (E.D. La. Aug. 26, 2010) ("[Plaintiff's] alleged losses and competitive disadvantage resulting from its exclusion from the VA market fall within the conceptual bounds of antitrust injury."). Nevertheless, the Court concludes that UAS is not a proper plaintiff, and therefore lacks antitrust standing, because it does not directly participate in the relevant market.

In *Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 423 (5th Cir. 2001), the Fifth Circuit explained that antitrust standing "requires the injured party to be a participant in the same market as the alleged malefactors." Thus, the court concluded that consumers of cigarettes lacked antitrust standing against cigarette manufacturers because they did not purchase cigarettes directly from the manufacturers, but instead bought them from retailers, who in turn bought them from distributors. *Id.* Similarly, in *Norris v. Hearst Trust*, 500 F.3d 454, 466 (5th Cir. 2007), the court held that newspaper distributors who were terminated for refusing the newspaper's request to provide falsely inflated distribution numbers, which would have allowed the newspaper to increase its advertising sales and revenue, lacked antitrust standing[6] because they were not "directly injured by the harm to

---

[6] Although the *Norris* court framed its discussion as addressing "antitrust injury," this Court has previously explained that this portion of the discussion is better read as addressing proper plaintiff

competition caused or posed by the asserted antitrust violations." The court explained that "the appropriate parties to sue" would be those seeking to purchase advertising from defendants (consumers) or other media selling advertising (defendant's competitors). *Id.*

Here, UAS "provid[es] technician and support services for physicians practicing allergy testing and allergen immunotherapy."[7] It "contracts with medical practices, including those who employ primary care and family physicians, to provide the equipment and non-physician technician services," and in return, "the provider pays UAS a set fee."[8] Plaintiffs explain:

> Before the entry of UAS into the market, primary care physicians often would refer patients with seasonal and perennial allergies to reference laboratories for allergy blood testing or to board-certified allergists for allergy skin testing and immunotherapy. With the entry of UAS, however, primary care physicians began utilizing the skin prick test in their own offices with the assistance of UAS, removing the referral to reference laboratories for allergy blood tests and board-certified allergists for allergy skin prick tests.[9]

Plaintiffs further allege that allergy-services companies such as UAS are paid "by the medical practice[,] which is often reimbursed by a 'third-party payor,' such as a commercial health insurance company."[10]

These allegations illustrate two important points: (1) UAS's customers are the primary care physicians and other medical practices seeking to provide allergy

---

status. *See Vaughn*, 2010 WL 3488244, at *12 & n.7. Notably, the *Norris* court held "that the district court properly dismissed the antitrust claims for lack of antitrust injury and antitrust standing," *Id.* at 469, which supports the conclusion that the court was analyzing both elements.

[7] (SAC, Rec. Doc. 145, at 6).
[8] *Id.* at 10.
[9] *Id.* at 11.
[10] *Id.* at 12.

testing and immunotherapy, not the patients seeking such services; and (2) it is primary care physicians, not UAS and other allergy-services companies, who compete directly with board-certified allergists for patients and, consequently, for reimbursements from third-party payors such as defendant insurance companies. Thus, the primary care physicians contracting with UAS have been "more directly harmed" by Defendants' anticompetitive behavior. *McCormack*, 845 F.2d at 1341. Although the causal link between UAS's injuries and Defendants' alleged boycott is not speculative, UAS cannot establish antitrust standing because it operates in a secondary market. *See Hughes*, 278 F.3d at 423 ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."). Accordingly, UAS's claims under the Sherman Act will be dismissed.

### B.    Associational Standing

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants contend that AAAPC lacks associational standing because it has not alleged that it has any members practicing medicine in Louisiana or Kansas or

that it has any members with reimbursement relationships with any of the defendant insurance companies. The first part of this argument is a red herring, conflating personal jurisdiction principles with standing requirements. For AAAPC's members to have standing, they must demonstrate (1) injury-in-fact, (2) causation, and (3) redressibility. *E.g.*, *McCall v. Dretke*, 390 F.3d 358, 361 (5th Cir. 2004). There is no geographical requirement in the standing analysis; thus, a plaintiff need not file suit in the place where the complained-of injury occurred.

Moreover, Plaintiffs allege that Defendants "attempt[ed] to organize a group boycott against and restrict competition and output from non-allergist physicians and their businesses and support staff, including AAAPC members and UAS" in "every localized market in Louisiana, Kansas, and various localized markets that Humana participates in across the country."[11] Plaintiffs further allege that AAAPC's members "include physicians who were coerced by Defendants."[12] The Court finds that Plaintiffs have alleged sufficient facts to establish AAAPC's associational standing.

## III.   FAILURE TO STATE A CLAIM

Defendants contend that Plaintiffs have failed to state a claim for any of their causes of action. The Court considers each in turn.

### A.   Sherman Act Section 1 (Conspiracy to Restrain Trade)

AAAPC[13] asserts that Defendants' actions violated Section 1 of the Sherman Act. Defendants contend that AAAPC has not adequately alleged an agreement or

---

[11] (SAC, Rec. Doc. 145, at 5, 15).
[12] *Id.* at 6.
[13] Because the Court concluded that UAS lacks antitrust standing for the Sherman Act claims, the Court analyzes these claims only with respect to AAAPC.

conspiracy because its theory does not "make economic sense" and they have not alleged that any Defendant took any action contrary to its independent self-interest. BC Louisiana and AllMed also contend that this claim is barred by judicial estoppel.

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "In order to state a claim under section 1 of the Sherman Act, a plaintiff must show that the defendants (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007) (internal quotation marks and citation omitted).

### 1.   *Whether AAAPC Has Alleged a Plausible Conspiracy*

To establish conspiracy or agreement, AAAPC must establish Defendants had a "conscious commitment to a common scheme" that "tends to exclude the possibility of independent action." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). AAAPC must do more than provide "an allegation of parallel conduct and a bare assertion of conspiracy"; it must allege "plausible grounds to infer an agreement." *Twombly*, 5520 U.S. at 556. Courts have found that plausible grounds for an agreement, sometimes referred to as "plus factors," include the following: "(1) actions that would be against the defendants' self-interest if the defendants were acting independently, but consistent with their self-interest if they were acting in concert; (2) a motive to conspire; (3) an opportunity to conspire; (4) market concentration and structure conducive to collusion; (5) pretextual explanations for

anticompetitive conduct; (6) sharing of price information; (7) signaling; and (8) involvement in other conspiracies." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711 (E.D. La. 2013). While this list is neither exclusive nor exhaustive, the first factor is generally considered the most important. *Id.*

Defendants first contend that their alleged conduct was in their rational, independent self-interest because their actions were aimed at identifying and addressing fraud, an essential function of insurance companies. However, the Court must accept as true AAAPC's contention that its members' provision of allergy testing and immunotherapy in conjunction with UAS is legitimate and not fraudulent. From this perspective, AAAPC plausibly alleges that Defendants' parallel conduct was contrary to their independent self-interest. Denying claims for these services, which would be reimbursed by their competitors, would not normally be in Defendants' self-interest, all else being equal, because it would tend to result in a loss of customers. However, by coordinating their activity and ensuring that the dominant players in each market were denying these claims, Defendants were able to limit their reimbursement expenses with minimal loss of customers. Additionally, threatening to kick providers (such as AAAPC's members) out of their networks for working with UAS would be contrary to Defendants' self-interest because it would reduce the size of their provider networks, which again would tend to result in a loss of customers. This first factor, which again is generally considered the most important, weighs in favor of finding a conspiracy at this stage of litigation.

Defendants' contentions that AAAPC's allegations "make no economic sense" amount to an argument that they lacked a motive to conspire. But AAAPC has articulated a plausible motive for Defendants' boycott: by limiting reimbursement to board-certified allergists, Defendants would reduce the availability of allergy testing and immunotherapy services, primarily to urban areas, where most allergists operate, thereby restricting the overall number of claims. By conspiring together, Defendants could reduce the number of claims paid while maintaining the same number of subscribers, thus increasing their profit margin.

Further, AAAPC has alleged that Defendants had opportunities to conspire through meetings in Texas, a conference in New Orleans, and via the National Health Care Anti-Fraud Association, and that the commercial health markets in Louisiana and Kansas were conducive to collusion due to BC Louisiana's and BC Kansas's market dominance. Finally, AAAPC has alleged a pretextual explanation for anticompetitive conduct by Humana, specifically that Humana denied claims on the basis of "pass through billing," rather than not medically necessary, as the other Defendants did, even though the other Defendants acknowledge that the claims should not have been denied on that basis. AAAPC's allegations satisfy five of the plus factors needed to infer a conspiracy.

Defendants' arguments, at bottom, amount to a contention that their proffered explanation of events is more plausible than AAAPC's. But that is not the question before the Court. "The question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are

sufficient factual allegations to make the complaint's claim plausible." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189 (2d Cir. 2012). "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* at 185.

Finally, Defendant AllMed contends that AAAPC has not sufficiently alleged its participation in the conspiracy. Specifically, AllMed contends that it lacked the ability to further the conspiracy because it does not participate in the market for allergy testing and immunotherapy and therefore cannot restrain trade in that market.

This reasoning is flawed. Section 1 requires a plaintiff to allege that the defendants engaged in a conspiracy that restrained trade, not that each individual defendant was able to independently restrain trade. *See, e.g.*, *Tunica Web*, 496 F.3d at 409. "Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed . . . to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act." *Spectators Commc'ns Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001).

AAAPC alleges that a representative of BC Louisiana sent AllMed a position statement outlining its proposal for AllMed to uphold claim denials as not medically necessary, and AllMed agreed to do so and received a fee for each claim reviewed.[14] Because denying claims for reimbursement was one of the primary methods BC

---

[14] (SAC, Rec. Doc. 145, at 30).

Louisiana, BC Kansas, and Humana used to effect their group boycott of AAAPC's members, AllMed's agreement to uphold BC Louisiana's claim denials demonstrates "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768.

Accordingly, the Court finds that AAAPC has stated a claim under Section 1 of the Sherman Act.

### 2.     *Judicial Estoppel*

Defendants further contend that, even if AAAPC has stated a Section 1 claim, it is estopped from bringing the claim because Plaintiffs brought a similar claim against other litigants in prior litigation in the Western District of Texas (the "Texas litigation"). *See United Biologics, LLC v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, No. 5:14-35, 2019 WL 830967, at *1 (W.D. Tex. Feb. 21, 2019).

"Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (internal quotation marks and citation omitted). For judicial estoppel to apply, Defendants must establish that (1) AAAPC's position "is clearly inconsistent with" its previous position; and (2) AAAPC "convinced the court to accept that previous position." *Id.* (internal quotation marks and citation omitted). However, judicial estoppel does not apply if AAAPC's position "is complementary with" its prior position. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 136 (5th Cir. 2005).

AAAPC contends that the claims in the Texas litigation involved a different conspiracy–specifically, a conspiracy by board-certified allergists, their trade groups, and a medical device manufacturer to persuade insurance companies not to reimburse Plaintiffs' claims–and that the existence of one conspiracy is not clearly inconsistent with another, similar conspiracy. Defendants reply that AAAPC is judicially estopped because here it is alleging the same injuries as in the Texas litigation but caused by different defendants.

In *Hall*, the defendant, GE, argued that the plaintiff was judicially estopped from bringing his products liability claim against it because the plaintiff had argued in an earlier lawsuit "that only Woods could be the manufacturer." 327 F.3d at 396 The court agreed, concluding that the plaintiff's earlier use of exclusive language, such as stating that Woods was "the only possible manufacturer," was clearly inconsistent with his present attempt to hold GE liable as the manufacturer. *Id.* at 398.

Here, by contrast, Defendants point to no statement by AAAPC in the Texas litigation that is clearly inconsistent with its current position. Rather, that allergists and others conspired to convince insurance companies to deny AAAPC's claims is complementary to, rather than inconsistent with, a conspiracy among insurance companies to deny such claims. Additionally, AAAPC contends that it learned of Defendants' conspiracy during the Texas litigation, which prompted it to file the instant suit while that action was still pending. Accordingly, the Court finds that Defendants have failed to establish that judicial estoppel applies to this claim.

**B.      Sherman Act Section 2 (Monopolization and Conspiracy to Monopolize)**

Section 2 of the Sherman Act forbids monopolization and attempts to monopolize. 15 U.S.C. § 2. The offense of monopolization requires both (1) the possession of monopoly power in a relevant market, and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Monopoly power is "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Additionally, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). "[T]o state a claim for conspiracy to monopolize, the plaintiff must allege that: (1) the defendant had the specific intent to monopolize, (2) a combination or conspiracy to monopolize existed, (3) there was an overt act in furtherance of the combination or conspiracy, and (4) there was an effect upon a substantial portion of interstate commerce." *Big River Indus., Inc. v. Headwaters Res., Inc.*, 971 F. Supp. 2d 609, 615 (M.D. La. 2013).

BC Louisiana and BC Kansas contend that AAAPC has failed to sufficiently allege a relevant market. This Court has previously explained the requirement of market definition in the context of a motion to dismiss:

> Plaintiffs' claim of monopolization under Section 2 of the Sherman Act requires allegations of a relevant market. Without a definition of a

> relevant market, there is no way to measure a defendant's ability to
> lessen or destroy competition.
>
> A relevant market has both product and geographic dimensions.
> Plaintiffs must plead facts sufficient to support this element to survive
> a motion to dismiss.
>
> The relevant product market must include all products, the use of which
> is reasonably interchangeable. Products that consumers view as
> substitutes for other products can be said to be in competition with each
> other. . . . A broad market may also contain relevant submarkets which
> themselves constitute product markets for antitrust purposes. . . .
>
> The relevant geographic market is the area of effective competition in
> which the seller operated, and to which the purchaser can practically
> turn for supplies. As with the relevant product market, courts analyze
> the relevant geographic market with reference to the cross-elasticity of
> demand.

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 376-77 (E.D. La.

Apr. 11, 2013) (internal quotation marks, alteration, and citations omitted). "Where

the plaintiff fails to define its proposed relevant market with reference to the rule of

reasonable interchangeability and cross-elasticity of demand . . . the relevant market

is legally insufficient, and a motion to dismiss may be granted." *PSKS, Inc. v. Leegin

Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010). "Nevertheless,

dismissal of an antitrust claim at the motion to dismiss stage for failure to plead the

relevant market adequately should not be done lightly because market definition is a

fact-intensive inquiry." *In re Pool Prods.*, 940 F. Supp. 2d at 378.

AAAPC contends that the relevant markets are the "markets for allergy testing

and allergen immunotherapy . . . in local areas throughout Louisiana, Kansas, and

other local markets serviced by Humana."[15] It explains that "[t]he area of effective

---

[15] (SAC, Rec. Doc. 145, at 1-2).

competition . . . tends to be relatively localized" because "there is a limit to how far patients will typically travel for allergy testing and allergen immunotherapy . . . given the economic tangible and intangible costs involved with such travel."[16] The alternatives to Plaintiffs' services in these markets are board-certified allergists (physicians who have completed a three-year fellowship program with the American Board of Allergy and Immunotherapy) or allergy blood testing at a reference laboratory.[17] The Court concludes that AAAPC has sufficiently defined the relevant markets, with both product and geographic dimensions, to survive a motion to dismiss. *See id.* (noting dismissal is appropriate where a plaintiff "attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes" or "fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way" (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)).

BC Kansas next contends that AAAPC has failed to allege that BC Kansas had monopoly power in the relevant market. BC Kansas points out that, while AAAPC alleges that it exercises market power in the commercial health market in Kansas, AAAPC provides no allegations indicating that it had monopoly power in the localized markets for allergy testing and immunotherapy in Kansas.

Regarding monopoly power, this Court has explained:

A nonconclusory allegation that a defendant holds a predominant share of the relevant market will usually satisfy the monopoly power element of a monopolization claim. The precise market share a defendant must control before it has monopoly power remains undefined, but, the case

---

[16] *Id.* at 15.
[17] *Id.* at 8, 13.

law supports the conclusion that a market share of more than 70 percent is generally sufficient to support an inference of monopoly power.

In contrast, courts almost never find monopoly power when market share is less than about 50 percent. The Fifth Circuit adheres to Judge Learned Hand's widely accepted rule of thumb that while a 90 percent market share definitely is enough to constitute monopolization, it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not.

*Id.* at 382 (internal quotation marks and citations omitted).

AAAPC alleges that BC Kansas is the dominant insurer in Kansas because "at least 47 percent of the Kansas residents who subscribe to full-service individual commercial health insurance and at least 58 percent of the Kansas residents who subscribe to small group policies are subscribers of" BC Kansas.[18] Although the Fifth Circuit has noted that market share of "about 50%, coupled with evidence of low number of actual competitors and high barriers to market entry" may establish monopoly power, *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984) (citing *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1352 & n.18 (5th Cir. 1980)), AAAPC has not alleged any facts regarding the number of competitors and barriers to entry in the commercial health insurance market. But even if it had, it still has not adequately explained how BC Kansas's alleged monopoly power in the commercial health insurance market translates to monopsony power in the market for allergy testing and immunotherapy. AAAPC acknowledges that third-party payors for allergy testing and immunotherapy include entities other than commercial health insurance companies, namely Medicare and Medicaid.[19] AAAPC

---

[18] (SAC, Rec. Doc. 145, at 19).
[19] (SAC, Rec. Doc. 145, at 12).

further acknowledges that approximately 2% of claims for allergy testing and immunotherapy services are paid for by consumers in full, without the support of a third-party payor.[20] Without specific allegations regarding the number of claims for allergy testing and immunotherapy services paid for by BC Kansas, other commercial health insurance companies, Medicare, and Medicaid, the only reasonable inference the Court can draw is that BC Kansas's market share is somewhat to markedly less than its 47-58% share of the commercial health insurance market, which is insufficient as a matter of law. *See Domed Stadium Hotel*, 732 F.2d at 489; *In re Pool Prods.*, 940 F. Supp. 2d at 382.

AAAPC attempts to bolster its claim with allegations that BC Kansas's conduct in excluding competition also demonstrates that it has monopsony power.[21] "However, conduct is rarely sufficient to show monopoly power without the existence of a high market share." *In re Pool Prods.*, 940 F. Supp. 2d at 384. Accordingly, AAAPC's monopolization claim against BC Kansas will be dismissed.

AAAPC's monopolization claim against BC Louisiana presents a closer question because, although it suffers the same deficiencies, BC Louisiana's extraordinarily high market share make it more reasonable for the Court to infer that it wields monopsony power in the market for allergy testing and immunotherapy. BC Louisiana's subscribers amount to "at least 73 percent of Louisiana residents subscribed to full-service commercial health insurance in the individual market and

---

[20] *Id.*

[21] AAAPC also asserts that BC Kansas has the power to control prices; however, it offers no nonconclusory allegations regarding this argument, and therefore the Court will not consider it.

at least 80 percent of Louisiana residents in the small group market," including 84% of subscribers in Alexandria, 86% of subscribers in Monroe, and 82% of subscribers in Shreveport/Bosier City.[22] Perhaps tellingly, unlike BC Kansas, BC Louisiana does not argue that AAAPC failed to allege that it has monopoly power in the relevant market.

Instead, BC Louisiana argues that its alleged conduct did not allow it to acquire, maintain, or expand its monopoly power. It points to allegations in the complaint that the Defendants "knew that if they stopped reimbursing unilaterally, each could lose market share to competitors who did not go along with the boycott."[23] AAAPC responds, in conclusory fashion, that denying these claims allowed BC Louisiana to drive up its profits, thereby solidifying its dominant position in the health insurance market. But this is contra how a monopolist typically acquires or maintains power. *Cf. Trinko*, 540 U.S. at 409 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608, 610-11 (1985)) (noting evidence of "a willingness to forsake short-term profits to achieve an anticompetitive end" may suggest monopolization in violation of Section 2). And, as AAAPC alleged and argued with respect to its Section 1 claim, the purpose of Defendants' conspiracy was to minimize the loss of subscribers by ensuring that enough of their competitors were also denying claims; thus, it is implausible that BC Louisiana could maintain or acquire monopoly power (i.e., increase its market share) by engaging in conduct that would cause it to lose subscribers. AAAPC's allegations about BC Louisiana's "covert"

---

[22] (SAC, Rec. Doc. 145, at 18).
[23] *Id.* at 23.

efforts to hide its policy cannot save this claim either, as subscribers would eventually learn about the policy when their claims were denied, at which point some would seek different insurance coverage.

Moreover, AAAPC's monopolization claim is implausible on its face because it rests on allegations that BC Louisiana excluded *providers* of services in a market in which it was a buyer, rather than *competitors*. Excluding some providers would tend to increase the market power of the remaining providers, thereby reducing whatever monopsony power BC Louisiana may have had. Accordingly, AAAPC has not alleged a plausible monopolization claim against BC Louisiana, and this claim will be dismissed. For these same reasons, the Court also concludes that AAAPC has failed to allege that either BC Kansas or BC Louisiana had the specific intent to monopolize, and its conspiracy to monopolize claim will be dismissed. *See Big River Indus.*, 971 F. Supp. 2d at 621 ("In order for a plaintiff to show that there was intent to monopolize, the plaintiff must demonstrate that the monopoly was plausible, or economically feasible.").

## C.    Tortious Interference with Contracts

Defendants contend that Plaintiffs have failed to satisfy the very narrow requirements for tortious interference with contract under Louisiana law. Plaintiffs contend that Texas, rather than Louisiana, law applies to this claim. Defendants respond that Plaintiffs have not alleged any interference with a Texas provider by Defendants.

Under Texas[24] law, tortious interference with contract requires a plaintiff to show: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damage or loss." *McGehee v. Hagan*, 367 S.W.3d 848, 854 (Tex. App. 2012). Plaintiffs allege that "UAS has had contractual agreements and business relationships with IASIS Healthcare, Hospital Corporation of America, [and] Texas Health Physicians Group . . . that had been resulting in expansion of locations within those systems, including in Texas and nationwide, that were adversely affected by the actions of Defendants."[25] The Court concludes that Plaintiffs have adequately alleged this claim at this stage of proceedings. *See Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*, No. SA-14-CV-35-OLG, 2014 WL 12497080, at *12 (W.D. Tex. Sept. 8, 2014).

### D.    Tortious Interference with Business Relations

Under Louisiana law, a claim for tortious interference with business relations requires a plaintiff to prove that the defendant "(1) acted with actual malice; (2) actually prevented the plaintiff from dealing with a third party; (3) acted improperly, i.e., not to protect legitimate interests; and (4) caused damage to the plaintiff." *IberiaBank v. Broussard*, 907 F.3d 826, 841 (5th Cir. 2018) (internal quotation marks, footnote, and citations omitted). "Significantly, it is not enough to allege that a defendant's actions affected plaintiff's business interests; the plaintiff must allege

---

[24] The Court assumes without deciding that Texas law applies to this claim because the parties have not briefed the choice of law issue.
[25] (SAC, Rec. Doc. 145, at 54).

that the defendant actually prevented the plaintiff from dealing with a third party."
*Bogues v. La. Energy Consultants, Inc.*, 46,434, p. 11 (La. App. 2 Cir. 8/10/11), 71 So.
3d 1128, 1135. Defendants contend that Plaintiffs have failed to sufficiently allege
the first two elements.

Plaintiffs contend that Defendants interfered with their business relations "by
taking a series of malicious actions to coerce [physician and medical practice group]
customers to terminate those relationships."[26] As an initial matter, the Court notes
that this tort applies only to *prospective* business relationships, rather than existing
ones: "Tortious interference is based on the principle that the right to influence others
not to *enter into* business relationships is not absolute." *Id.* at 11, 71 So. 3d at 1134
(emphasis added). This tort parallels the common-law tort of intentional interference
with prospective contractual relations, except that Louisiana limits its applicability
by requiring a showing of actual malice. *See id.* (citing Restatement (Second) of Torts
§ 766B (Am. Law Inst. 1979) ("Intentional Interference with Prospective Contractual
Relation")); *Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 10 (5th Cir. 1992). Thus,
allowing Plaintiffs to base this claim on allegations of interference with existing
contracts would be to allow them to make an end run around the strict requirements
for tortious interference with contract under Louisiana law. *See Belle Pass Terminal
v. Jolin, Inc.*, 618 So. 2d 1076, 1080 (La. Ct. App. 1993) (describing elements of
tortious interference with contract).

---

[26] (Rec. Doc. 153, at 18).

Accordingly, the Court finds that Plaintiffs have failed to state a claim for tortious interference with prospective business relations because they have not alleged that they were actually prevented from dealing with an identifiable third party due to Defendants' actions. In *Bogues*, the plaintiff-in-counterclaim, a lessee of oil and gas interests, claimed that a group of lessors interfered with its business relations "by knowingly making false statements to other lessors to influence them to break their leases with [plaintiff] and to other companies to cast doubt on [plaintiff] as a prudent operator." 46,434, p. 10, 71 So. 3d at 1134. The court held that the plaintiff had failed to state a claim because there were "no factual allegations describing any conversation between a particular [defendant] and any particular entity with whom [plaintiff] was attempting to confect a business relationship." *Id.* at 12, 71 So. 3d at 1135.

Here, the closest Plaintiffs come is their allegation that UAS had "a prospective agreement with Tenet Healthcare" that was "adversely affected by the actions of Defendants to existing medical practices doing business with UAS."[27] Plaintiffs continue, "Once certain locations and providers were harassed by Defendants . . . , other providers and locations were deterred from contracting with UAS even though they were located elsewhere."[28] Plaintiffs further assert that "ongoing attempts by UAS to reengage prior customers or expand to additional customers has been hindered by the continued misinformation that Humana, BCBSKS, and BCBSLA have previously spread and continue to spread to those customers and other health

---

[27] (SAC, Rec. Doc. 145, at 54).
[28] *Id.*

30

insurance companies."[29] Under *Bogues*, these allegations are insufficient to state a claim because they fail to establish that UAS had a prospective contractual relation with a specific third party that was actually prevented by Defendants' conduct. Therefore, this claim will be dismissed.

### E.   Fraud

Plaintiffs contend that BC Louisiana and AllMed made intentional misrepresentations to UAS and AAAPC members by falsely stating, each time that a claim was denied, that the claim was for services that were "not medically necessary" and that BC Louisiana and AllMed had made the determination "independently."[30] Plaintiffs assert that such representations were false because the services fit the criteria for medical necessity, BC Louisiana and AllMed had agreed in advance to deny these claims *en masse* as not medically necessary because that would be the most difficult to challenge, and BC Louisiana had decided to send all such claims to AllMed rather than randomly allocating them to independent review organizations.

Under Louisiana law, a claim for fraud requires a plaintiff to establish: "(1) a misrepresentation of material fact; (2) made with intent to deceive; and (3) causing justifiable reliance with resultant injury." *E.g.*, *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 418 (5th Cir. 2008). Defendants contend that Plaintiffs have failed to allege that they justifiably relied on Defendants' representations because they challenged BC Louisiana's determinations on appeal, requested peer-to-peer review of AllMed's decisions rather than conform to them, and

---

[29] *Id.*
[30] *Id.* at 65.

sought a meeting with the Louisiana Insurance Commissioner to discuss the claim denials.

The Court agrees that Plaintiffs have failed to allege justifiable reliance as to the determination that the claims were not medically necessary, because Plaintiffs vigorously contested those determinations, first on appeal and later before the insurance commissioner. *See, e.g.*, *Thomas v. Chambers*, No. 18-4373, 2019 WL 485781, at *3 (E.D. La. Feb. 7, 2019) ("[A] party asserting fraud is required to allege that it was unaware that the opposing party's representation was false, and that the misrepresentation caused it to act differently than it would have had it known the truth."). However, the Court finds that Plaintiffs have adequately alleged this claim as to the misrepresentation that the review process was "independent" and therefore legitimate, rather than predetermined and designed to deny these claims. Because Plaintiffs were unaware that the review process was not independent, they continued to provide services and appeal the denial of their claims with the hope that their position would be vindicated. Notably, at the meeting with the insurance commissioner, an employee of BC Louisiana "boasted that every single claim that BCBSLA had denied on the basis of medical necessity and that had been appealed, was upheld on independent review," an assertion which Plaintiffs contend is another instance of Defendant's fraud.[31] Unlike the merits of the claim denials, Defendants' assertion that the claim review process was independent has not been previously

---

[31] (SAC, Rec. Doc. 145, at 43).

challenged by Plaintiffs and, as explained, was relied upon by Plaintiffs in continuing to provide services, bring claims, and challenge denials on appeal.

Finally, Defendants contend that this claim is prescribed because the allegedly fraudulent statements were made in 2014 or 2015, beyond the one-year prescriptive period from when Plaintiffs filed their complaint in 2018. Plaintiffs contend that they only learned of BC Louisiana and AllMed's fraud "late in the Texas litigation."[32] Defendants contend that Plaintiffs learned about this arrangement between BC Louisiana and AllMed from a deposition of BC Louisiana in 2016 and cite generally to an over 100-page deposition in support. Contrary to Defendants' assertion, they have not established that this document is referenced in the complaint and central to Plaintiff's claim. Additionally, the Court will not consider the document under Rule 12(d) at this time because Plaintiffs have not had an opportunity to respond, as the transcript was filed with Defendants' reply. Accordingly, Defendants' motions will be denied as to this claim.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the Motions **(Rec. Docs. 67, 69, 131)** are **GRANTED in part** and **DENIED in part**. The motions are **GRANTED** as to (1) UAS's claim under Section 1 of the Sherman Act,[33] (2) Plaintiffs' claims under Section 2 of the Sherman Act, and (3) Plaintiffs' claim for tortious interference with business

---

[32] (Rec. Doc. 153, at 23).
[33] *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) ("Unlike a dismissal for lack of constitutional standing, . . . a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6).").

relations, and these claims are **DISMISSED WITH PREJUDICE**. The motions are

**DENIED** as to (1) AAAPC's claim under Section 1 of the Sherman Act, (2) Plaintiffs'

claim for tortious interference with contract, and (3) Plaintiffs' fraud claim arising

from BC Louisiana's and AllMed's representations that the review process conducted

by AllMed was independent.

New Orleans, Louisiana, this 17th day of July, 2020.

_____

CARL J. BARBIER

UNITED STATES DISTRICT JUDGE