UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ACADEMY OF ALLERGY &                          CIVIL ACTION
ASTHMA IN PRIMARY CARE, ET
AL.                                           NO. 18-399

VERSUS                                        SECTION: "J"(2)

LOUISIANA HEALTH SERVICE
AND INDEMNITY COMPANY, ET
AL.

## ORDER AND REASONS

Before the Court are three motions for summary judgment on Plaintiffs'
Sherman Act Section 1 Claim filed by Defendants, Humana, Inc. ("Humana") **(Rec.
Doc. 443)**, Blue Cross and Blue Shield of Kansas, Inc (BCBSKS) **(Rec. Doc. 449)**,
Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of
Louisiana (BCBSLA), and AllMed Healthcare Management, Inc ("AllMed") **(Rec.
Doc. 447)** (collectively, "Defendants"); a consolidated opposition to all three motions
(Rec. Doc. 464) filed by Plaintiffs, Academy of Allergy & Asthma in Primary Care
("AAAPC") and United Biologics, LLC d/b/a United Allergy Services ("UAS")
(collectively, "Plaintiffs"); and Defendants' replies thereto (Rec. Doc. 475, 472, 468).
Having considered the motion and legal memoranda, the record, and the applicable
law, the Court finds that the motions should be **GRANTED.**

## FACTS AND PROCEDURAL BACKGROUND

This case arises out of an alleged conspiracy among health insurance
companies to restrict competition in a multi-state market for allergy testing and
allergen immunotherapy. Plaintiff Academy of Allergy & Asthma in Primary Care

1

("AAAPC") is a 503(C)(6) non-profit organization, composed of member primary care physicians ("PCPs") who provide allergy and asthma treatments to patients. Plaintiff United Biologics, LLC, d/b/a United Allergy Services ("UAS") provides technicians and equipment along with allergy testing and immunotherapy support services for primary care physicians (PCPs). UAS, which is not a licensed medical provider, has a business model to contract directly with PCP practices. UAS technicians, who are not required to have medical training, perform allergy tests in the physicians' offices and prepare up to 300 units of antigens that patients administer at home for subcutaneous allergy immunotherapy over the course of a year. The PCP is not necessarily in the room where UAS technicians work with patients, and most UAS patients perform their immunotherapy at home. UAS would prepare the bill for the physicians to submit to the insurance company, but UAS does not contract directly with health insurance companies. Instead, physicians submit the claims to health insurers for the allergy testing or immunotherapy services and then pay some amount back to UAS. UAS would not appear on the claims that PCPs submit to health insurers.

Starting in 2010, Defendants each began looking into UAS's business practices. Humana's Special Investigations Unit (SIU) discovered a billing spike associated with allergy testing and immunotherapy from several PCPs. Humana's investigation raised several concerns about UAS including that Humana's coverage policy excluded at-home administration of allergy shots, that UAS billed for services they rendered under the PCP's name, that UAS operated as a revenue generator for physicians, and

that a Humana member had an extreme reaction to a UAS allergy test. In April 2010, a Humana SIU Investigator created a post on the National Health Care Anti-Fraud Association ("NHCAA") database where insurance companies share information about potentially fraudulent schemes. The post described the UAS business model and was viewed hundreds of times by other insurance companies. Eventually, Humana referred its concerns to the FBI and the Fraud Unit of the Texas Department of Insurance and began denying claims from PCPs working with UAS on pass-through billing grounds (that the PCP was not actually rendering the service).

In May 2013, a BCBSKS SIU employee attended a BCBS Association training academy where she learned about UAS from a BCBS Texas employee in a case-sharing session. BCBSKS also began investigating UAS's services and billing practices in 2013 and 2014 and stopped paying claims from PCPs working with UAS based on medical necessity. BCBSLA also investigated whether the allergy services offered by PCPs contracting with UAS were medically necessary after the May 2013 BCBS Association case sharing session. BCBSLA contracted with Defendant AllMed, an independent review organization, to review its medical necessity policy as well as its denials based on medical necessity. BCBSLA began denying claims submitted by PCPs relying on the UAS protocol in December 2013.

Plaintiffs allege that, because Defendants interfered with UAS-contracting PCPs, UAS was forced to leave several states, including Louisiana and Kansas, so patients' access to allergy testing and immunotherapy has been reduced and Defendants now pay less in reimbursements for allergy care. In their Second

Amended Complaint, Plaintiffs brought five claims against the health insurance companies named defendants here. (Rec. Doc. 145). Four of the claims have been litigated at the motion to dismiss or summary judgment stage:

1. Count One: Sherman Act § 1 Violation (Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sherman Act, Section 1). On July 17, 2020, the Court granted Defendants' motion to dismiss UAS's claim under Section 1 of the Sherman Act. (Rec. Doc. 195). However, on May 14, 2021, on Plaintiffs' motion for reconsideration, the Court found that Plaintiffs sufficiently alleged antitrust standing and reinstated the claim. (Rec. Doc. 217).

2. Count Two: Sherman Act § 2 Violation against BCBSKS and BCBSLA (Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance and Conspiracy to Monopolize the Relevant Market in Violation of the Sherman Act, Section 2). The Court granted Defendants' motion to dismiss this claim, finding that Plaintiffs did not allege any facts regarding the number of competitors and barriers to entry in the commercial health insurance market nor the number of claims for allergy testing and immunotherapy claims paid for by the insurers. (Rec. Doc. 195).

3. Count Three: Tortious Interference with Existing and Prospective Contracts and Business Relations, Civil Conspiracy and Aiding and Abetting against All Defendants. After Defendants filed motions for summary judgment on Count Three, Plaintiffs moved to voluntarily dismiss this claim. The Court dismissed the claim on July 14, 2023 in open court. (Rec. Doc. 407)

4. Count Four: Fraud, Civil Conspiracy to Commit Fraud, and Aiding and Abetting against BCBSLA and AllMed. The Court initially denied Defendants' motion to dismiss this claim, finding that Plaintiffs adequately alleged that BCBSLA and AllMed misrepresented that the review process was independent. (Rec. Doc. 195). However, the Court granted Defendants' motion for partial summary judgment as to Count Four, finding that the claims had prescribed. (Rec. Doc. 303).

5. Count Six[1]: Declaratory Relief against All Defendants. Plaintiffs seek a declaration that Defendants' efforts to exclude Plaintiffs violate federal law, specifically Medicare and Medicaid implementing regulations and federal laws (the Affordable Care Act) that prohibits "discrimination against primary care physicians for providing services within the scope of their licensures and certifications." (Rec. Doc. 145, at 67).

The instant motions concern Count One of Plaintiffs' Second Amended Complaint, which alleges defendants violated § 1 of the Sherman Act. (Rec. Doc. 145). Specifically, Plaintiffs claim that Defendants combined and conspired amongst themselves and other competitors and third parties to restrict competition for allergy testing and immunotherapy services in certain local areas where patients travel for health care services, known as Core Based Statistical Areas ("CBSAs"), including CBSAs in Louisiana, Kansas, and other states. *Id.* at 56-57. Plaintiffs allege that, in furtherance of their conspiracy, Defendants engaged in a coordinated campaign to

---

[1] The fifth claim is labelled "Count Six," for reasons that have not been revealed to the Court.

boycott UAS and drive it from the market by jointly refusing to pay for allergy skin testing or immunotherapy services in which UAS or UAS-contracting PCPs are involved by deciding that those services are not medically necessary or constitute pass through billing. *Id.* at 57. Plaintiffs also claim that Defendants attempted to intimidate physicians not to do business with UAS and attempted to push governmental investigators into false investigations of UAS. *Id.* Plaintiffs allege that Defendants' actions are an illegal boycott and price fixing scheme that eliminated and restricted Plaintiffs' ability to market and provide allergy testing and immunotherapy services. *Id.* at 57-58.

On July 17, 2020, the Court granted Defendants' motion to dismiss UAS's claim under Section 1 of the Sherman Act. (Rec. Doc. 195). However, on May 14, 2021, on Plaintiffs' motion for reconsideration, the Court found that Plaintiffs sufficiently pled antitrust standing and reinstated the Section 1 claim. (Rec. Doc. 217).

Defendants now seek summary judgment on Plaintiffs' claims in Count 1, arguing that Plaintiffs lack evidence of a conspiracy between them.[2] In response, Plaintiffs argue that substantial evidence demonstrates each Defendant knowingly joined the conspiracy, that Defendants misstate binding precedent, and that Defendants' explanations do not justify their conspiratorial conduct. (Rec. Doc. 464, at 8-9). In reply, Humana notes that Plaintiffs only provided evidence that could be consistent with both an alleged conspiracy and independent conduct, which is not enough to sustain an inference of conspiracy. (Rec. Doc. 475, at 4). BCBSKS notes

---

[2] Defendants have also moved for summary judgment on Count 1 arguing that UAS and AAAPC each lacks standing. (Rec. Docs. 444, 450).

that Plaintiffs were unable to point to any evidence at all that BCBSKS agreed with the other Defendants to boycott UAS. (Rec. Doc. 472, at 4). BCBSLA and Allmed reply that the communications on which Plaintiffs base their entire case are among anti-fraud professionals discussing suspected fraud, which is consistent with each insurer acting independently and does not support an inference of an unlawful boycott. (Rec. Doc. 468, at 1-2). They also reassert that state immunity statutes expressly authorize insurance companies to discuss suspected fraud with other insurance companies. *Id.* at 3-4.

The parties initially filed their motions, memoranda, and exhibits under seal. (Rec. Doc. 361). The Court then ordered they re-file public versions of the sealed documents with redactions of patient information. (Rec. Doc. 434). The Court held oral argument on the motions on September 21, 2023. (Rec. Docs. 437, 438).

## **LEGAL STANDARD**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56); *see Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but

a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See id.* at 325; *Little*, 37 F.3d at 1075.

## DISCUSSION

In general, summary judgment requires inferences to be drawn from the underlying facts to be viewed in the light most favorable to the nonmovant. However, to survive summary judgment in an antitrust case, "a plaintiff seeking damages for a violation of § 1 must present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984)). The Supreme Court has "emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct," such as cutting prices to increase business. *Matsushita*, 475 U.S. at 593-594. Courts should also avoid drawing inferences to "support a claim that makes no economic sense," because "[r]ational economic actors do not ordinarily conspire to injure themselves." *Spectators' Communs. Network Inc. v. Colonial Country Club*, 253 F.3d 215, 219-20 (5th Cir. 2001) (citing *Matsushita*, 475 U.S. at 587).

Section 1 of the Sherman Antitrust Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A claim under Section 1 of the Sherman Act requires proof of three elements: (1) that the defendant "engaged in a conspiracy (2) that restrained trade (3) in a particular market." *Id.* at 220. "It is well-established that only unreasonable restraints on trade actually violate the Sherman Act." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d

835, 848 (5th Cir. 2015) (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).[3]

The instant motions contend that Plaintiffs cannot meet their burden on the first element of their claim: that Defendants engaged in a conspiracy. A conspiracy requires "direct or circumstantial evidence that reasonably tends to prove" that the conspirators had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768. For the conspiracy element, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (internal quotations omitted). Mere exchange of information, or even consciously parallel action, is insufficient to establish a conspiracy under § 1. *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 294 n. 30 (5th Cir. 1988). "The mere showing of relationships between alleged conspirators" is also insufficient to imply a conspiracy. *Id.* Thus, a plaintiff "must show that there was a single plan, the essential nature and general scope of which

---

[3] To determine whether a restraint is unreasonable, courts use either the "rule of reason" or the "per se rule." *MM Steel*, 806 F. 3d at 848. Most agreements are analyzed under the rule of reason, which takes into account a variety of factors including information about the business, its condition before and after restraint was imposed, and the restraint's history, nature, and effect. *Id.* Other agreements, such as group boycotts involving a horizontal conspiracy to foreclose a market participant, have a pernicious effect on competition and lack any redeeming value, so they are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. *Id.* (citing *United States v. Gen. Motors Corp.*, 384 U.S. 127, 146 (1966)).

Plaintiffs have filed a motion for summary judgment requesting that the Court use a per se rule because they argue Defendants conduct meets the definition of a group boycott that is per se illegal. (Rec. Doc. 452). Because Plaintiffs' motion is predicated on the assumption that a conspiracy will be proven, the Court must resolve the instant motions (whether a conspiracy existed) before determining which rule is appropriate to analyze the alleged conspiracy.

was known to those responsible for its implementation." *Id.* (internal citation omitted). A plaintiff can satisfy this element using either direct or circumstantial evidence. *Golden Bridge Tech., Inc. v. Motorola Inc.*, 547 F.3d 266, 271 (5th Cir. 2008).

## I. Plaintiffs' Purported Direct Evidence

In this case, Plaintiffs argue that they have presented direct evidence of a conspiracy between the Defendants; (Rec. Doc. 464, at 33); and Defendants contend that none of the evidence Plaintiffs cite is direct evidence of a conspiracy; (Rec. Docs. 475, at 6; 472, at 4; 468, at 5). "Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences in order to support a conspiracy claim." *Golden Bridge Tech.*, F.3d at 271 (internal citation omitted). "Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1." *Id.* Instead, direct evidence of a conspiracy "explicitly refer[s] to an understanding" between the alleged conspirators. *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002) (citing *Southway Theatres, Inc. v. Ga. Theatre Co.*, 672 F.2d 485, 493 n. 8 (5th Cir.1982). Direct evidence cannot be ambiguous and is "tantamount to an acknowledgment of guilt." *In re Pool Prod.*, 158 F. Supp. 3d at 551 (quoting *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014)).

Plaintiffs claim that Defendants formed a conspiracy after a May 22, 2013 meeting in Michigan where BCBS Texas investigators communicated to the other "Blues," including BCBSKS and BCBSLA, their suggestion to deny all claims

associated with UAS. (Rec. Doc. 464, at 28). Plaintiffs allege that the following contemporaneous communications and actions are references to an understanding between the parties, and are thus direct evidence of Defendants' alleged conspiracy:

1. Notes from a July 25, 2014 phone call between a Humana representative, Christa Jewsbury, and a BCBSLA representative, Latisha Mire. The notes state that Ms. Mire said that BCBSLA was "denying everything" related to UAS and that BCBSLA "confirmed that all the other private plans she has talked to (all the big ones) confirmed they are denying for mostly pass through billing / services not rendered – only some med nec." (Rec. Doc. 464-123, at 4).

2. A July 25, 2014 email from Ms. Mire to representatives from Humana and other insurers, including BCBSKS, where Ms. Mire asked if other insurance companies were denying claims of physicians working with UAS. (Rec. Doc. 464-115). The email states that, the following week, BCBSLA would attend a meeting with UAS and state regulators because UAS had asserted that BCBSLA was the only plan not paying for UAS's allergy services, so Ms. Mire was trying to determine the accuracy of this statement. *Id.* Five insurers later responded, confirming that they had stopped or reduced payments for UAS's services. (Rec. Doc. 464, at 37).

3. Instances of BCBSKS representatives reaching out to other insurers to discuss UAS-related claims. A January 27, 2014, an email between two BCBSKS employees states that one employee visited with another insurance company regarding UAS, Coventry, and Coventry's representative "expressed concerns

about non specialists providing 'specialty' care." (Rec. Doc. 262-92, at 1). In an April 9, 2014 email, a BCBSKS employee requested permission to discuss UAS during an in-person meeting with other insurers regarding health care fraud. (Rec. Doc. 464-111). In an October 8, 2015 email, a BCBSKS employee reached out to BCBS Kansas City to ask if they were familiar with UAS and noting that BCBSKS was watching the UAS billing codes that a Kansas City provider was entering. (Rec. Doc. 464-124). The BCBS Kansas City representative responded that she would take a fresh look at the billing. *Id.* BCBSKS later stated in an email to a provider that it would not contract with UAS due to fraud, waste, and abuse issues in other states (Rec. Doc. 464-137).

4. The post Humana shared within the confines of a closed National Health Care Anti-Fraud Association ("NHCAA") forum, which was viewed by hundreds of representatives from other insurance companies. (Rec. Doc. 464-61). The post states that "providers in several states have been identified by a billing spike" associated with physicians contracting with UAS. *Id.* at 2. The post notes that Humana's coverage policy excludes injections administered by the patient at home. *Id.* Several insurers then contacted Humana after viewing this post to learn how Humana was handling UAS-related claims. (Rec. Doc. 464, at 36). Plaintiffs state, without citation, that "(1) the NHCAA itself disputes that this communication was "routine and legitimate"; (2) these conspiratorial actions would not have been taken unless they were for the Insurer Defendants' "own

interests"; and (3) government actors were not present and their presence does not immunize conspiratorial actions anyway." *Id.* at 37.

5. Internal documents from a non-party (Highmark BCBS) stating that, "If one of the goals is to 'shut-down' UAS, how will that most efficiently be done? Partnering with other Blue Plans? What is their strategy?" (Rec. Doc. 464-80, at 3). Highmark also created an internal spreadsheet listing the reasons other insurance plans, including Defendants, were providing for refusing UAS claims. The spreadsheet states that BCBSLA was denying on medical necessity, BCBSKS was denying pass through billing, and Humana was not paying in any state. (Rec. Doc. 464-81).

Plaintiffs argue that the evidence listed above constitutes direct evidence, rather than circumstantial evidence, and that Defendants misconstrue the legal standard for direct evidence as "an express written agreement." (Rec. Doc. 464, at 34). Plaintiffs cite to the Fifth Circuit's reversal of summary judgment in *Tunica Web Advertising v. Tunica Casino Operators Association* because the district court failed to credit references to a "gentleman's agreement," which was "direct evidence" of an agreement. 496 F.3d 403, 410-411 (5th Cir. 2007). However, the *Tunica* court also based that reversal on other emails demonstrating meetings among the conspirators, such as a meeting where the conspirators "reaffirmed their boycott" and "again decided to refuse to advertise on" the plaintiff's website. *Id.* Plaintiffs argue that the holding in *Tunica* demonstrates that emails reaffirming a previous refusal to deal

with a segment of the market are direct evidence of an agreement in this case. (Rec. Doc. 464, at 35).

Plaintiffs also cite to *Monsanto Co. v. Spray-Rite Service Corp.*, in which the Supreme Court held that direct evidence of an agreement included "communications among conspirators to refuse to deal followed by that very refusal, and did not include any express admission of an agreement." 465 U.S. at 756-66. In *Monsanto*, direct evidence of an antitrust conspiracy included testimony that Monsanto approached its distributors and advised that they should maintain Monsanto's suggested price, or else the distributors would not receive adequate supplies of Monsanto's herbicide. *Id.* at 765. When a distributor did not assent, this information was referred to the Monsanto regional office, which complained to the distributor's parent company, and the parent company would instruct its subsidiary to comply. *Id.* The subsidiary distributor then informed Monsanto it would charge the price Monsanto suggested, and the Court found that "evidence of this kind plainly is relevant and persuasive as to a meeting of minds." *Id.* Another example of direct evidence of a conspiracy in that case was a newsletter from a distributor to his customers after a meeting with Monsanto officials, discussing Monsanto's efforts to "get the market place in order," "every effort will be made to maintain a minimum market price level," and that "harmony can only come from following the rules of the game and that in case of dispute, the decision of the umpire is final." *Id.* at 765-766. The Court found that this newsletter referred to an agreement or understanding or "rules of the game:" that distributors and retailers would maintain prices, Monsanto would not undercut those

prices at retail, and Monsanto would terminate competitors who sold at lower prices. *Id.* at 766.

Unlike the evidence in *Monsanto* and *Tunica*, which implicitly reference an agreement between the alleged conspirators, none of the evidence Plaintiffs cite to here refers, implicitly or explicitly, to an agreement between Defendants. Instead, the evidence shows that Defendants researched and investigated potential fraud by inquiring as to other companies' policies as to UAS. None of the insurance companies recommended that any other company follow a specific policy, and none of the evidence shows Defendants referencing an effort to align the companies' policies with each other.

Plaintiffs also note that, in another case involving the same plaintiffs, the Western District of Texas found that the defendants in that case had an unduly narrow view of what constitutes direct evidence, because the defendants argued that the evidence did not reference an express agreement to institute a policy. *Acad. of Allergy & Asthma in Primary Care*, 2022 WL 18076843 at *15. In that case, the court stated that evidence can "directly support an antitrust conspiracy even if it does not precisely lay out all the details of the agreement." *Id.* (citing *Tunica*, 496. F.3d at 410). However, the Fifth Circuit requires that direct evidence of an antitrust conspiracy must "explicitly refer to an understanding between the alleged conspirators;" *Golden Bridge Tech.*, F.3d at 271; not simply "directly support an antitrust conspiracy;" *Allergy & Asthma in Primary Care*, 2022 WL 18076843 at *15. Considering that the evidence in this case neither references an agreement nor lays

out the details of an agreement, the Court finds that none of the evidence in this case rises to the level of evidence that directly supports an antitrust conspiracy, without requiring additional inferences. Again, direct evidence cannot be ambiguous, and even conduct among competitors that is consciously parallel does not establish the conspiracy required for a § 1 claim. *Golden Bridge Tech.*, F.3d at 271.

None of the evidence in this case unambiguously or explicitly refers to an understanding between Defendants, nor is it tantamount to an acknowledgment of guilt. First, the emails between BCBSLA and BCBSKS do not reference any agreement between the companies, and instead state that BCBSLA was contacting the other defendant in advance of its meeting with the Louisiana Commissioner of Insurance and UAS to verify the truthfulness of UAS's representation to the Commissioner that BCBSLA was the only health insurer not paying UAS claims. (Rec. Doc. 464-115). This email and subsequent notes from a phone call between the parties do not demonstrate that the companies agreed to boycott UAS.[4] Plaintiffs attempt to frame the emails as verifying a pre-existing agreement, but this framing is contrary to the language in the email itself and to the stated purpose for the email. If this stated purpose was pretextual, the inferences required would take this evidence out of the scope of the definition of direct evidence.

---

[4] BCBSKS also argues that Plaintiffs lack evidence that a person who had authority to bind BCBSKS communicated with any alleged co-conspirator at any time about UAS. (Rec. Doc. 449-1, at 18-19 n. 3) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 561 (5th Cir. 1980); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999)). "[I]t is appropriate to require that, before the acts of [a party's] employees . . . subject them to the possibility of antitrust treble damages, those acts be authorized by the corporation." *Pan-Islamic Trade Corp.*, 632 F.2d at 561. The communications here are not between employees with authority to bind Defendants, and Plaintiffs failed to respond to this argument.

Next, Plaintiffs argue that direct evidence of a conspiracy exists because BCBSKS reached out to other insurance companies (Coventry and BCBS Kansas City) to discuss why UAS claims "should be denied, without prompting." (Rec. Doc. 464, at 36). Again, Plaintiffs have misrepresented the text of the emails in their memorandum. Instead, the emails show that BCBSKS employees spoke with employees at other insurance companies about what procedures those companies were following for UAS claims. BCBSKS employees did not ask why UAS claims *should* be denied. These emails do not reference an understanding explicitly or implicitly and are not direct evidence of an agreement.

Plaintiffs also argue that Humana's 2010 post to the NHCAA forum is direct evidence that Defendants participated in the alleged conspiracy, because the post was "dissemination of misinformation. . . targeting, identifying, and denying UAS-related claims." (Rec. Doc. 464, at 36). Plaintiffs argue that this post and the subsequent actions of other insurance companies to contact Humana require no further inference to show a conspiracy. *Id.* Plaintiffs state, without citation to the record, that the NHCAA disputes that this post was routine and legitimate. *Id.* at 37. To Plaintiffs, "it is difficult to understand how a communication to other insurers (including Humana's competitors) about UAS, which prompted said insurers to contact Humana about its denial of UAS-related claims, amounts to 'acting independently.'" *Id.* However, to the Court, it is not difficult to understand that this post to a closed healthcare fraud forum was a unilateral act on Humana's part, and other insurers' decisions to respond to the post were also independent acts. Humana also posted this

message three years before the alleged conspiracy began in 2013, and there is no evidence to support UAS's conclusory statements that the post was "misinformation" or not otherwise legitimate. Furthermore, the post does not reference an agreement or support an antitrust conspiracy without additional inferences. Therefore, the Court concludes that Humana's 2010 post to the NHCAA forum is not direct evidence of an antitrust conspiracy.

Finally, the internal spreadsheet document from non-party Highmark does not contain direct evidence of the alleged conspiracy. The document itself does not reference any agreement, and the author of these documents, Susan Collare, was clear in her deposition that Highmark never entered into an agreement with Humana (or anyone else) related to UAS. (Collare Deposition; Rec. Doc. 469-42, at 10-11) ("The only thing that we do with the other plans is we talk about the billing patterns we're seeing, and that's it. But we —we would never partner with another plan as far as addressing an issue that we found. Highmark does its own independent investigation, and any recommendations that we make are based on our findings, our findings only. . . We would not have been partnering with other plans to create policy.").

In sum, none of the evidence on which Plaintiffs rely directly establishes, without additional inferences, that Defendants agreed to or engaged in a conspiracy to boycott UAS. Accordingly, the Court considers the foregoing evidence among the totality of the circumstantial evidence Plaintiffs present.

## II. Circumstantial Evidence and Plus Factors

Without direct evidence of an unlawful conspiracy, the Court must consider Plaintiffs' claim under the stricter standard required for Section 1 claims based on circumstantial evidence: whether the evidence in the record tends to exclude the possibility that Defendants acted independently. *See Matsushita*, 475 U.S. at 587–88.

An antitrust plaintiff relying on circumstantial evidence of a conspiracy must present evidence that "tend[s] to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 554; *Matsushita*, 475 U.S. at 587–88. Such circumstantial evidence must be strong, however, because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita*, 475 U.S. at 588. Indeed, although the agreement need not be proved directly, the plaintiff must show that there was

> a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences. Repetitive or parallel transactions may establish the existence of such a joint venture, but isolated instances, explicable without reference to a continuing or broader program, may not.

*H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 245 (5th Cir. 1978) (quoting *Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971)). The evidence must warrant a finding that the alleged co-conspirators had a "meeting of the minds in an unlawful arrangement." *Id.* (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)).

As the Court explained previously, "independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the

contract, combination, or conspiracy required by § 1." *Golden Bridge*, 547 F.3d at 271.

"Neither will conduct that is consistent with other, equally plausible explanations

give rise to an inference of conspiracy." *In re Pool Prod. Distribution Mkt. Antitrust*

*Litig.*, 158 F. Supp. 3d 544, 551 (E.D. La. 2016) (J. Vance) (quoting *Stewart Glass &*

*Mirror, Inc. v. U.S. Auto Glass Disc. Centers*, Inc., 200 F.3d 307, 315 (5th Cir.2000))

(internal quotation marks omitted); *see also Southway Theatres, Inc. v. Ga. Theatre*

*Co.*, 672 F.2d 485, 494 (5th Cir. 1982) ("[T]he inference of a conspiracy is always

unreasonable when it is based solely on parallel behavior that can be explained as

the result of the [defendants'] independent business judgment ....").

So, if an antitrust plaintiff relies solely on circumstantial evidence of an alleged

conspiracy, the plaintiff must establish both conduct among competitors that is

consciously parallel and certain "plus factors*." In re Pool Prod.*, 158 F. Supp. 3d at

551 (citing *Royal Drug Co., Inc. v. Grp. Life & Health Ins. Co.*, 737 F.2d 1433, 1437

(5th Cir. 1984)). The "plus factors" ensure that courts punish concerted action and

actual agreements rather than unilateral, independent conduct of competitors. *Id.*

(citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004)). "There is

no exhaustive list of "plus factors" in the Fifth Circuit, but courts have considered

factors including

> (1) actions that would be against the defendants' self-interest if the
> defendants were acting independently, but consistent with their self-
> interest if they were acting in concert; (2) a motive to conspire; (3)
> opportunities to conspire; (4) market concentration and structure
> conducive to collusion; (5) pretextual explanations for anticompetitive
> conduct; (6) sharing of pricing information; (7) signaling among
> competitors; (8) and other traditional facts suggestive of conspiracy.

*Acad. of Allergy & Asthma in Primary Care et al. v. Superior Healthplan, Inc., et al.*,
No. SA-17-CA-1122-FB, 2022 WL 18076843, at *13 (W.D. Tex. July 14, 2022), *report
and recommendation adopted sub nom. Acad. of Allergy & Asthma in Primary Care
v. Superior Healthplan, Inc.*, No. CVSA17CA1122FBHJB, 2022 WL 18034365 (W.D.
Tex. Oct. 18, 2022) (citing *JSW Steel (USA) Inc. v. Nucor Corp.*, No. 4:21-CV-01842,
2022 WL 489321, at *7 (S.D. Tex. Feb. 17, 2022)); ABA SECTION OF ANTITRUST
LAW, Proof of Conspiracy Under Federal Antitrust Laws 69–91 (2010)). In sum, an
antitrust plaintiff will survive summary judgment only if "the inference of conspiracy
is reasonable in light of competing inferences of independent action or collusive action
that could not have harmed the plaintiff." *Tunica*, 496 F.3d at 409 (quoting
*Matsushita*, 475 U.S. at 588).

Without any direct evidence of an unlawful conspiracy, the Court must
examine the circumstantial evidence in the vast record in this case to determine
whether Defendants engaged in consciously parallel conduct and whether any plus
factors suggest a group boycott among Defendants. Defendants argue that Plaintiffs
have no such evidence. (Rec. Docs. 443-1, at 16; 449-1, at 19; 447-1, at 20). Plaintiffs
state that "this is not a case where Defendants merely engaged in parallel conduct.
There is direct evidence that the co-conspirators spread misinformation to convince
other insurers to target UAS and deny UAS-related claims." (Rec. Doc. 464, at 47).
Plaintiffs go on: "Across the board, the Insurer Defendants and their co-conspirators
did not begin to identify UAS-contracting physicians or implement a 'policy' to deny

UAS-related claims *until* they were solicited by a fellow conspirator." *Id.* (emphasis in original).

The Court reiterates that there is no direct evidence that Defendants engaged in a conspiracy or unlawful, anticompetitive agreement in this case. Plaintiffs contend that Defendants' exchange of information, which Plaintiffs call "misinformation to shut down UAS," is circumstantial evidence of their conspiracy. (Rec. Doc. 464, at 44). That evidence includes the same May 2014 internal document from non-party Highmark, which Plaintiffs argue shows a goal to shut down UAS in the context of partnering with other insurers that it talked to, and those communications implicate each Defendant. *Id.* at 31. That document, which appears to be an internal memo or notes, states, in relevant part, "*If* one of the goals is to shut down UAS, how will that most efficiently be done?" (Rec. Doc. 464-80, at 3) (emphasis added). Whether or not shutting down UAS was Highmark's goal is posed as a question, and Highmark's record of this question does not tend to prove that Defendants (remember, Highmark is not a defendant) had a conscious commitment to a common scheme designed to achieve an unlawful objective. Again, the author of this document testified that no agreement existed, and she never discussed shutting down UAS with Defendants. Further, if Highmark was a part of the alleged conspiracy, it is not clear to the Court why Plaintiffs did not include them as a defendant in the instant matter.

Next, as to the communications between Defendants, Plaintiffs seem to argue that Defendants' exchange of information is circumstantial evidence of a conspiracy

to boycott UAS. Plaintiffs state that "longstanding caselaw is clear that when competitors directly communicate about refusals to deal and then themselves directly take action consistent with those communications, the communications are sufficient evidence of an agreement to do so." (Rec. Doc. 464, at 44). However, longstanding caselaw does not establish this rule; instead, both gathering information *and* an agreement are required. In 1925, the Supreme Court noted that "it was not the purpose or the intent of the Sherman Anti-Trust Law to inhibit the intelligent conduct of business operations." *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 583 (1925). In fact, when information is gathered and disseminated among members of a trade or business as "the basis of an agreement or concerted action to lessen production arbitrarily or to raise prices beyond the. . . price which would prevail if no such agreement or concerted action ensued," that "concerted action constitutes a restraint of commerce and is illegal." *Id.* at 585-86. More recently, the Fifth Circuit has clarified that mere showing of relationships between alleged conspirators and consciously parallel action is insufficient to establish a conspiracy. *Consol. Metal Prods.*, 846 F.2d at 294 n. 30. Instead, the evidence must show that there was an actual agreement. *Id.*

Plaintiffs' evidence demonstrates a relationship between Defendants and conduct that is somewhat parallel: researching UAS and developing policies for UAS claims. However, even viewing the evidence in the light most favorable to Plaintiffs, the evidence that Defendants independently created policies for dealing with UAS and shared information about those policies does not reasonably tend to prove that

Defendants had an agreement to boycott UAS. Plaintiffs frame the timeline of the conspiracy as starting in 2010, when Humana and BCBS Texas[5] made complaints about UAS to "any government agency they could find;" however, Plaintiffs only cite to emails by BCBS Texas reporting UAS to the Texas Department of Insurance (Rec. Doc. 464, at 12). Then, after Humana's NHCAA post in May 2013, BCBS Texas contacted Humana to "learn more about how Humana was treating UAS-related claims." *Id.* at 13.

Also in May 2013, the BCBS Association hosted an investigator training session, and Plaintiffs allege that, there, BCBS Texas "encourage[d] the other insurance investigators to investigate UAS and target its PCP customers." *Id.* As evidence that BCBS "encouraged" this behavior, Plaintiffs cite an email exchange between BCBSKS employees recounting the case sharing portion of the training session, stating that "investigators from Texas started telling us about this entity called United Allergy." (Rec. Doc. 464-28). The email goes on to explain the UAS business model (always billing for 300 units and the 95165 code even when the physician is not involved in the actual preparation of the antigens) and states that "there are questions about the mixing of antigens and whether they are diluted, safe or effective. Most of the 175 patient interviews done by Texas revealed the patients never completed their year of injections…" *Id.* Despite Plaintiffs' representation of this evidence, this email exchange does not show that the BCBS Texas investigator

---

[5] BCBS Texas, like Highmark, was not made a party to this case, despite Plaintiffs' claims that it also participated in the instant anticompetitive conspiracy.

"encouraged" other companies to investigate UAS. The Court finds that it is not circumstantial evidence of any type of agreement.

Next, Plaintiffs state that, at a July 2013 meeting between BCBSLA representatives and BCBS Texas representatives, BCBS Texas informed BCBSLA how to identify UAS-contracting PCPs, that BCBS Texas previously used administrative denial of claims but was now capping the number of units at 100, and that Humana was denying UAS claims based on pass through billing. (Rec. Doc. 464, at 14-15). After the meeting, Plaintiffs assert that BCBSLA "changed its reimbursement policy to copy BCBS Texas' restrictions, while internally seeking alternative paths to eliminate reimbursements altogether." *Id.* at 15. Plaintiffs cite to an internal BCBSLA email stating that, after visiting BCBS Texas, BCBSLA's Medical Director believes that "100 units is too many" and that "our goal should be to deny all claims from [UAS]." (Rec. Doc. 464-47, at 2). Again, this email exchange does not tend to prove that Defendants committed to a single plan. Instead, even viewing this email in the light most favorable to Plaintiffs, this email exchange demonstrates that BCBSLA employed a different, independent course of action from BCBS Texas: denying all claims, rather than capping the number of units.

Plaintiffs also state that BCBSLA "repeatedly contacted other payors to coordinate efforts relating to UAS." (Rec. Doc. 464, at 15). They cite to an investigation log where a BCBSLA investigator documented speaking with representatives from BCBS Texas, who informed her that the FBI and US Attorney's Office was working on this case. (Rec. Doc. 464-50). The investigator also spoke to an

investigator at BCBSKS who "verified that they are rejecting [UAS] claims as no pass through." *Id.* Plaintiffs also cite to an internal email between BCBSLA employees, with meeting minutes attached. (Rec. Doc. 464-51). The meeting minutes do not refer to UAS, but Plaintiffs state that they "contain[] numerous strongly suggestive references." (Rec. Doc. 464, at 15 n. 6). The Court disagrees. None of this evidence suggests or references that there was a single plan or agreement between Defendants or that BCBSLA tried to "coordinate" efforts. Instead, at most, this evidence simply shows that BCBSLA exchanged information, which, without more, is insufficient to establish a § 1 conspiracy.

Plaintiffs also point to Humana's NHCAA post, stating that "the NHCAA concedes this post likely violated its antitrust and information-sharing guidelines," citing to deposition testimony (Rec. Doc. 464, at 16). The cited deposition testimony from NHCAA representative Louis Saccoccio states:

> A: Yeah, I mean, obviously -- well, to the extent that they're talking about whether to deny claims or not, that would probably be something that we would not on one of our conference calls want them to talk about.
> Q: And the -- the reason being is because you have certain guidelines as an association that you follow?
> A: Yes.

(Saccoccio Dep., Rec. Doc. 464-60, at 22). Although this testimony indicates that insurance companies discussing whether to deny claims "would probably" violate the NHCAA's guidelines, Saccoccio's testimony does not actually state that Humana's post violated the NHCAA's antitrust and information-sharing guidelines. More importantly, the testimony also does not show that there was a plan to boycott UAS.

Plaintiffs emphasize other similar communications, including BCBSLA's vice-president's presentation to a group of insurers on various schemes during a private Healthcare Fraud Prevention Partnership committee meeting. (Rec. Doc. 464, at 17). That presentation included UAS-related claims and stated the insurance companies' total exposure and potential recovery. *Id.* Plaintiffs also note other occasions when Humana discussed UAS at a Midwest Anti-Fraud Insurance Association meeting for the purpose of receiving "input from other carriers if they are running into the same issue and how they might be handling." *Id.* at 18. Again, merely exchanging information is insufficient to establish a conspiracy, and none of this evidence demonstrates that the co-conspirators agreed to a plan to boycott UAS.

Plaintiffs also note that Defendants each began denying UAS-related claims and told PCPs that they would no longer be reimbursed for allergy care. *Id.* at 19-21. Although these denials occurred around the same years in 2013 and 2014, none of the evidence Plaintiffs provide regarding these companies' decisions to deny claims reasonably tends to prove that Defendants formed an agreement to boycott UAS. Instead, the evidence provided demonstrates that each Defendant's conduct stemmed from independent decisions based on extensive investigation and research, rather than a tacit agreement between Defendants. Furthermore, the evidence indicates that Defendants' investigations spanned different periods, included different concerns, and resulted in different policies unique to each insurance company. Plaintiffs present no evidence that there was a single plan, the essential nature and scope of which was known to each Defendant in this case. Instead, Plaintiffs present

isolated business decisions that are explicable without reference to a broader program aimed at eliminating UAS from business. Accordingly, the Court finds that the evidence that Plaintiffs characterize as circumstantial evidence does not warrant a finding that Defendants had a meeting of the minds in an unlawful anticompetitive arrangement. *See H & B Equip. Co.*, 577 F.2d at 245.

Even if there was circumstantial evidence of consciously parallel conduct, none of the "plus factors" that may be relevant in this case weigh in favor of a finding that Defendants engaged in a conspiracy. First, none of Defendants' actions would be against their self-interests if they were acting independently. Investigating unusual billing patterns, seeking to keep costs low, investigating potential fraud, and denying claims are all within health insurance companies' business interests. Second, there is no indication that Defendants had a motive to conspire with other health insurance companies to deny UAS-related claims; each company employs investigators to research potential fraud and denies claims not covered under their contracts. Third, even construing the evidence in the light most favorable to Plaintiffs, none of the evidence supports a finding that Defendants' investigations and denials of UAS-related claims were pretextual. The record in this case shows that Defendants and other government actors were concerned about fraud, waste, abuse, pass-through billing, and medically unnecessary services. Plaintiffs offer no evidence that these concerns were pretextual explanations for anticompetitive conduct.

Therefore, viewing the record as a whole, the Court finds that the evidence presented is insufficient to raise a genuine issue of material fact as to the existence

of a conspiracy to boycott UAS among the Defendants in this case. Specifically, the evidence in this case does not reasonably tend to prove that Defendants engaged in a conspiracy, the first element of a claim under Section 1 of the Sherman Act.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' three motions for summary judgment on Plaintiffs' Sherman Act Section 1 Claim filed by Defendants, Humana, Inc. ("Humana") **(Rec. Docs. 443, 449, 447)** are **GRANTED**. Plaintiffs' antitrust claim based on Section 1 of the Sherman Act is **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 27th day of November, 2023.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE